545 F.2d 194
 178 U.S.App.D.C. 116
 ALASKA AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Wien Air Alaska, Inc., Alaska Airlines Master Executive
Council, Intervenor.
BP ALASKA, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Wien Air Alaska, Inc., Alaska Airlines Master Executive
Council, Intervenor.
 Nos. 75-1670, 75-1674.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 8, 1976.
Decided Oct. 28, 1976.
 
 Marshall S. Sinick, Washington, D.C., with whom Benjamin P. Lamberton and Fisher & Gelband, Washington, D.C., were on the brief, for petitioner Alaska Airlines, Inc.
 Quinn O'Connell, Washington, D.C., with whom Connole & O'Connell, Ernest C. Baynard, III, and Thomas M. Ryan, Washington, D.C., and Glen E. Taylor, Dallas, Tex., of counsel, were on the brief, for petitioner BP Alaska, Inc.
 Thomas L. Ray, Atty. for C.A.B., Washington, D.C., with whom James S. Schultz, Gen. Counsel, Jerome Nelson, Deputy Gen. Counsel, Robert L. Toomey, Atty., C.A.B., Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Samuel R. Simon, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondent.
 
 
 1
 Theodore L. Seamon, Washington, D.C., with whom Lawrence D. Wasko, Seamon & Wasko, and Howard G. Feldman, O'Connor & Hannan, Washington, D.C., of counsel, were on the brief, for intervenor Wien Air Alaska, Inc.
 
 
 2
 Burwell, Hansen & Manley, Washington, D.C., were on the brief, for intervenor Alaska Airlines Master Executive Council.
 
 
 3
 Before ROBINSON and WILKEY, Circuit Judges, and JAMESON,* Senior District Judge.
 
 
 4
 Opinion for the court filed by District Judge JAMESON.
 
 
 5
 JAMESON, District Judge.
 
 
 6
 This is an appeal by Alaska Air Lines, Inc. (ASA), and British Petroleum Alaska Inc. (BP)[1] from Orders 75-6-93 and 75-8-153 adopted by the Civil Aeronautics Board (CAB) in Docket 27617 on June 19, 1975, and August 29, 1975, respectively. The orders precluded ASA from operating regular and frequent intra-Alaska charters from Anchorage/Fairbanks to the Alaskan North Slope. Wien Air Alaska, Inc. (Wien) has intervened on behalf of the CAB, and Alaska Airlines Master Executive Council (MEC), an Alaska union representing airline pilots, has intervened on behalf of petitioners. Petitioners seek a remand to the Board with directions that a hearing be held on the withdrawal of ASA's authority to operate charters to the North Slope.
 
 BACKGROUND
 Parties
 
 7
 ASA is a commercial airline which operates scheduled flights between Seattle and Portland and points in Alaska, and scheduled and charter flights within Alaska. BP is an international oil firm responsible for the construction of oil production facilities in the western half of the oil fields in the Alaskan North Slope. MEC is a union representing pilots of ASA and did not participate in the proceedings before the CAB. Wien is a commercial airline engaged in scheduled and charter service within Alaska.
 
 Regulation of Alaskan Air Carriers
 
 8
 Under the Federal Aviation Act (the Act) a certificated, regularly-scheduled carrier is authorized to provide charter service to points not named in its certificate subject to regulations prescribed by the CAB. Section 401(e)(6), 49 U.S.C. § 1371(e)(6). These regulations, set forth in 14 C.F.R. § 207 (Part 207), limit the amount of off-route charter service that may be offered. The limitation is intended to protect carriers with scheduled service from substantial diversion by off-route charter service offered by other carriers and to prevent certificated carriers from operating extensive charter operations at the expense of their scheduled service.
 
 
 9
 Part 207 also provides that no carrier except an "Alaskan air carrier" may perform any charter trip within the state of Alaska. 14 C.F.R. §§ 207.2, 207.7. An "Alaskan air carrier" is defined in Part 292 of the CAB's regulations, adopted pursuant to Section 416(a) of the Act, 49 U.S.C. § 1386(a), as one "which engages in air transportation (a) solely between points within the State of Alaska, or (b) solely between points within the State of Alaska and points in Canada . . . ." 14 C.F.R. § 292.1. When originally adopted, Part 292 restricted all off-route charters by Alaskan air carriers to services which were "casual, occasional, or infrequent" and not "made in such manner as to result in establishing a regular or scheduled service."
 
 
 10
 Prior to 1951, ASA qualified as an Alaskan air carrier since its authority was confined to intra-Alaska operations. In that year, however, it was granted authority to operate between Alaska and Portland/Seattle, United States-Alaska Service Case, 14 C.A.B. 122 (1951), thereby ending its status as an Alaskan air carrier. But the CAB, pursuant to Section 416(b) of the Act, 49 U.S.C. § 1386(b), granted ASA an exemption from the provisions of § 292.1 to the extent that they "would otherwise prevent" ASA "from being classified as (an) Alaskan Air Carrier . . . with respect to . . . (its) operations wholly within . . . Alaska." 14 C.A.B. at 123. Without this exemption ASA would have been precluded from operating any off-route charters within Alaska. This exemption has remained in effect and is the source of the authority whose scope is at issue in this appeal.[2] In effect the exemption permits ASA to conduct interstate, intra-state, and charter operations.
 
 
 11
 Until 1959, ASA's charter operations were limited by the terms of Part 292 to "casual, occasional, or infrequent" services. Part 292 was amended in 1959 to relax the casual service restriction and make it applicable only to off-route charters "to and from points outside Alaska . . . ." 14 C.F.R. § 292.2. This allowed Alaskan air carriers to conduct virtually unlimited intra-state charter service.
 
 
 12
 In 1971, following extensive hearings, the CAB reshuffled air routes in Alaska. Alaska Service Investigation, Order 71-12-45 (1971), aff'd sub nom. Western Airlines v. C.A.B., 161 U.S.App.D.C. 319, 495 F.2d 145 (1974). The CAB awarded ASA a new Seattle to Anchorage route, suspending Pan American's and Western Airlines' certificates to serve Ketchikan and Juneau, and thereby giving ASA a monopoly of scheduled service between those two cities and the lower 48 states. The CAB also awarded Wien a certificate of public convenience and necessity, pursuant to 49 U.S.C. § 1371(d), to conduct scheduled service between Anchorage/Fairbanks and Prudhoe Bay on the North Slope.[3]
 
 
 13
 BP began its oil operations on the North Slope in 1969 and since then has been a user of Wien's scheduled air service to Fairbanks and Anchorage. Early in 1974 BP began to intensify its development activities on the North Slope, building a huge personnel center and diverse production facilities, and increasing the number and length of its employees' work shifts.[4] As a result, BP was required to make greater use of transportation between the North Slope and Anchorage/Fairbanks.
 
 
 14
 Believing that the service provided by Wien was insufficient to meet its needs, BP requested ASA to establish a charter service. On February 3, 1975, ASA and BP agreed to a month-to-month renewable contract by which ASA provided service with a Boeing 727 jet aircraft between Fairbanks/Anchorage and Prudhoe Bay. ASA was providing five charters per week when, on August 29, 1975, the CAB issued its final order denying ASA authority to continue the charter arrangement with BP. As a result of this decision, ASA has closed down its Anchorage-based pilot facilities, transferred that base to Seattle and laid off five pilots who were employed in the charter operation.[5] Subsequently, ASA has "dry-leased" one of its 727's to BP to allow the service to continue. Under the dry-lease arrangement BP leases only the plane from ASA, providing its own crew and maintenance.
 
 Proceedings
 
 15
 On March 13, 1975, Wien filed a petition requesting the CAB to either declare that ASA was no longer an "Alaskan air carrier" within the meaning of Part 292 and that the exemption ordered in 1951 did not cover the BP-ASA charter service or, alternatively, to revoke or amend that exemption to terminate ASA's authority to conduct intra-Alaskan charters. ASA filed an answer seeking dismissal of Wien's petition. Subsequently BP filed an answer requesting dismissal or in the alternative that a hearing be held on the legal and factual issues presented.
 
 
 16
 On June 17, 1975, the CAB, without holding an evidentiary hearing or oral argument, issued Order 75-6-93 stating:
 
 
 17
 "The exemption authority presently held by Alaska Airlines, Inc., pursuant to order of the Board in the United States-Alaska Service Case . . . be and it hereby is amended to clarify that said exemption does not permit the operation by Alaska Airlines, Inc. of regular or frequent charter services in the Anchorage/Fairbanks-Prudhoe Bay/Sag River markets . . . ."
 
 
 18
 The decision was based on three findings: (1) that under the 1959 amendment to Part 292, the CAB had never intended "to permit the carrier to operate frequent and regular off-route charters in markets receiving a full pattern of scheduled service by a certificated airline"; (2) that the ASA-BP charter arrangement would produce substantial diversions of revenue from Wien; and (3) that Wien's scheduled service was adequate to serve the needs of BP.
 
 
 19
 Both ASA and BP filed petitions for reconsideration, contesting the factual conclusions reached in the order and arguing (1) that there was no substantial evidence that the Board, in granting ASA its 1951 exemption, did not intend to permit ASA to conduct charter operations like that conducted to Prudhoe Bay, and (2) that a hearing was required as a matter of law prior to any action by the CAB. By Order 75-8-153 issued August 29, 1975, the CAB denied the petitions for reconsideration, finding petitioners' factual allegations unpersuasive and no need for an evidentiary hearing, which would result in delays "with possible severe consequences for (Wien's) ability to operate effective scheduled service for the general traveling public. . . . " ASA and BP thereupon filed with this court motions to amend their petitions for review to include Order 75-8-153, which were granted on September 12, 1975.[6]
 
 Factual Contentions
 
 20
 ASA and BP alleged in their pleadings the existence of facts which, if established at a hearing, would undermine Wien's position. They contend that (1) Wien does not provide adequate service to enable BP to shuttle its personnel to and from Prudhoe Bay and to meet its production requirements, and (2) with the increasing traffic to Prudhoe Bay there will be no diversion of revenues from Wien, particularly since Wien cannot accommodate the increased traffic. Although considerable data on these issues was presented to the CAB, no evidentiary hearing was held to establish for the record the quantum and substantiality of the facts relied upon to support petitioners' contentions.[7]
 
 ISSUES
 
 21
 The issues presented on the petitions for review of the CAB's orders are:
 
 
 22
 (1) Was an evidentiary hearing required before amendment of ASA's authority to conduct regular intra-Alaska charter service?
 
 
 23
 (2) Was the CAB's order reasonable and supported by substantial evidence?
 
 I. NEED FOR A HEARING
 
 24
 Petitioners and intervenor MEC contend that a hearing should have been held by CAB by reason of (1) due process requirements, (2) procedures specified under the Administrative Procedure Act (APA), and (3) requirements of the Federal Aviation Act. While the contentions asserted and authorities cited present close questions, overall we find the argument of petitioners to be the more persuasive.
 
 A. Due Process Requirements
 
 25
 Petitioners contend that the exemption authority held by ASA constituted "property" within the meaning of the Fifth Amendment, requiring that notice and hearing be afforded before amendment or restriction of that authority. Petitioners base their contention on recent Supreme Court cases dealing with the concept of property: Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).[8] In these cases the Court rejected the "distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights". Board of Regents v. Roth, 408 U.S. at 571, 92 S.Ct. at 2706. Instead the present inquiry is whether there is a "legitimate claim of entitlement" to the interest involved.
 
 
 26
 As the Court in Bell v. Burson, holding that a hearing must be held before suspension of a driver's license, noted:
 
 
 27
 "Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. (Citations omitted.) This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege'." 402 U.S. 535 at 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90.
 
 
 28
 This concept of property was further refined in Board of Regents v. Roth, involving the right of a non-tenured teacher to a pretermination hearing, in which the Court said:
 
 
 29
 "Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." 408 U.S. at 577, 92 S.Ct. at 2709.
 
 
 30
 Applying this analysis, it appears that ASA has a "claim of entitlement" to the exemption allowing it to operate regular and frequent charters without limitation in Alaska. The Board itself granted the exemption allowing ASA to continue as an "Alaskan air carrier" and amended § 292.2 of its regulations to allow such carriers to conduct unlimited operations within Alaska.[9] These rules have been relied upon by ASA since their adoption in framing the scope and nature of its operations.[10] While it is not clear that the exemption authority is as broad as ASA contends, ASA nonetheless has a "legitimate claim of entitlement" to it, which requires that a hearing be held to allow ASA the opportunity to vindicate that claim.
 
 
 31
 Furthermore, the nature of this administrative proceeding impels us to the conclusion that due process requires that an opportunity for hearing be afforded. The CAB and Wien contend that the proceeding before the Board was merely one to interpret the scope of ASA's exemption, thus not requiring a hearing. However, as ASA and BP correctly argue, and as a careful examination of the Board's Order 75-6-93 reveals, the proceeding involved more than an interpretation of the exemption. As the Order indicates, the proceeding was also adjudicatory in nature, centering on the facts involved in the ASA/BP charter and its effect on Wien the diversion of passengers and cargo from Wien, the adequacy of Wien's service, and the need for ASA's charter service. Rather than confining itself to interpretation of the exemption which it issued to ASA in 1951, the Board expanded its inquiry to include the specific charter operations of ASA on the North Slope. The proceeding thus took on more than an interpretative character, becoming basically adjudicatory and centering on the operations of ASA.
 
 
 32
 Where adjudicative, rather than legislative,[11] facts are involved, the parties must be afforded a hearing to allow them an opportunity to meet and to present evidence. The determinative inquiry is whether the agency is engaged in rule-making, a legislative function which requires no hearing, or in adjudication, a judicial function which may require a hearing to resolve disputed facts. Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908); Bi-Metallic Investment Co. v. State Bd. of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915). In United States v. Florida East Coast R. Co., 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), the Supreme Court approved this distinction and indicated that the key question was whether the agency's action pertained to a class of individuals, indicating a rule-making function, or whether it focused on a particular individual, indicating an adjudicative function requiring a hearing.[12] As this court said in American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App.D.C. 310, 359 F.2d 624, 631 (1966), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966):"Where the agency is considering an order against a particular carrier or carriers there is protection through the requirement of the adjudicatory procedure appropriate for such individual actions and amendments . . . ."
 
 
 33
 The CAB's Order 75-6-93, at least in part, focuses on ASA and its North Slope charter activities. While the CAB and Wien contend that the proceeding concerned a class of carriers of which ASA happened to be the only member, the concern of the Board with ASA's particular operation rather than with other similar past operations or conditions in other air markets indicates that the Board was dealing with ASA individually and not in a class context. Therefore, the Board should have provided the parties a hearing to allow them to present and refute evidence concerning the charter operations.
 
 B. Requirement of Hearing Under the APA
 
 34
 Petitioners also contend, alternatively, that the Board's action, if not adjudicatory, was a rule-making function which, according to the requirements of the APA, 5 U.S.C. § 553, required notice and an opportunity by the parties to participate. However, since the CAB action was in our view adjudicatory, we need not deal with this contention.
 
 
 35
 C. Requirement of Hearing Under the Federal Aviation Act
 
 
 36
 Petitioners argue further that a hearing was required because Wien's petition in the CAB proceeding was, in essence, a complaint within the scope of section 1002(a) of the Federal Aviation Act, 49 U.S.C. § 1482(a). That section allows the initiation of an enforcement proceeding by the filing of "a complaint in writing with respect to anything done or omitted to be done by any person in contravention of any provisions of this Act, or of any requirement established pursuant thereto".[13] Section 1002(c), 49 U.S.C. § 1482(c), provides for issuance, upon good cause, of an order compelling compliance after notice and hearing on the issue of non-compliance.
 
 
 37
 The CAB contends, however, that the proceeding basically involved the exercise of its exemption power pursuant to 49 U.S.C. § 1386(b). It also asserts that it performed an interpretive function by clarifying the preexisting limits of ASA's authority to conduct off-route charters within Alaska, and notes that the courts have long held that § 1386(b) contains no hearing requirement. See, e. g., Eastern Air Lines v. C.A.B., 87 U.S.App.D.C. 331, 185 F.2d 426 (1950), vacated as moot, 341 U.S. 901, 71 S.Ct. 613, 95 L.Ed. 1341 (1951); American Airlines, Inc. v. C.A.B., 97 U.S.App.D.C. 324, 231 F.2d 483 (1956).
 
 
 38
 Intervenor Wien contends that the CAB performed only an interpretive function and that all statutory provisions dealing with certificate amendments and enforcement proceedings are irrelevant. Both Wien and the CAB reject the argument that the proceeding was essentially one for enforcement under § 1482(a), stating that while Wien's petition rested upon its belief that ASA was acting "in contravention of the Act," Wien did not ask the Board to so find but asked only for an order defining the scope of ASA's charter authority. They argue also that the Board did not find ASA to be in violation of the Act or deserving of punishment.[14]
 
 
 39
 While Wien's petition was not brought expressly under § 1482(a), it does involve elements of similarity to a proceeding contemplated by that section. The parties have not cited, nor have we found, any cases interpreting § 1482(a). The parties rely on two cases of this court interpreting § 1386. The first, Airline Pilots Association v. C.A.B. (ALPA I), 148 U.S.App.D.C. 24, 458 F.2d 846 (1972), proceeded on the premise that an exemption to CAB regulations is valid only so long as the statutory prerequisites for that exemption continue to exist. The court there required the CAB to hold hearings in order to make findings before removing such an exemption. The second, Airline Pilots Association v. C.A.B. (ALPA II), 161 U.S.App.D.C. 199, 494 F.2d 1118 (1974), held that on remand the CAB did not abuse its discretion in refusing to grant an evidentiary hearing on one of the issues arising from the remand, where sufficient supportive facts were established on that point in an earlier administrative rule-making proceeding.
 
 
 40
 All parties, except ASA, attempt to rely on these cases as supportive of their respective positions. Neither case, however, is directly in point, and their relevance to the issue at bar is limited. ALPA I involved a situation in which exempt carriers agreed with certificated airlines to take over service on some of their authorized routes. The court was faced with the question of the continued validity of the carriers' exemptions. In the present case we have a different factual situation, involving the issue of the scope, rather than the continuing validity, of a carrier exemption. Not only is the case factually distinguishable, but the legal principles enunciated therein are unsupportive of either position. While it is true, as CAB argues, that ALPA I indicates that hearings are not always required, the court did in fact remand for a hearing. 458 F.2d at 852. On the other hand, it cannot be said that ALPA I shows a clear need for a hearing in this case, as ASA and BP argue. The court narrowly limited its holding to require a hearing "when a non-certificated carrier substantially takes over the route of a certificated carrier." 458 F.2d at 851. The narrow scope of the holding is indicated by these statements of the court:
 
 
 41
 "By remanding these cases, we do not require the Board to make findings as to the continued existence of the statutory prerequisites for exemption whenever a non-certificated carrier expands its operations, with or without the approval of the agency." 458 F.2d at 849.
 
 
 42
 "We leave open, for determination on a case-by-case basis as new fact situations arise, the difficult question of what other situations might call for such a hearing." 458 F.2d at 851.
 
 
 43
 ALPA I is neither controlling nor particularly helpful with regard to the issue we must determine here.
 
 
 44
 ALPA II is likewise of little help. There the court, on appeal following the remand, held that the CAB's findings continuing the carriers' exemptions, which were made after a show cause hearing, were rationally based. The portion of the opinion relied on by the parties here dealt with the propriety of the show cause hearing as opposed to a full evidentiary hearing. Again, however, that portion of the holding was narrowly limited. The full-scale hearing issue was raised only as to the substantive issue of the need for protective labor provisions for employees of the certificated carriers whose operating authority had been suspended in favor of the exempted carriers over those air routes covered by their agreement. It was not directed toward the requirement of an evidentiary hearing on the question of the continuing validity of the carriers' exemptions. The issue was further restricted by the confined scope of ALPA's contention, as the court noted:
 
 
 45
 "To be sure, ALPA's principal argument is not that full-scale hearings on labor protective provisions must be held in every exemption or suspension case, but that such hearings were required in this particular case because our prior opinion specifically so directed." 494 F.2d at 1128.
 
 
 46
 The Court found that ALPA I did not specify the type of hearing necessary, and held that the hearing requirement was satisfied by the show cause proceeding. 494 F.2d at 1129. Thus, while the court held that an evidentiary hearing was not required, that holding was directed toward the subject of labor protective provisions and apparently did not involve the factual disputes presented in this case.
 
 
 47
 In our opinion the proceeding here was not one within § 1386, as the CAB contends, because it did not involve the granting or revocation of a carrier exemption, but merely concerned the scope of operations permissible under an existing exemption. As noted previously, neither was the proceeding solely of an interpretive nature, as Wien argues. The factual issues considered by the Board added an adjudicatory flavor to the proceeding, bringing it close to the type of proceeding contemplated by § 1482(a). While the CAB and Wien contend that the proceeding was not pursuant to § 1482 because the relief sought was not punitive in nature and because questions of violations of the Federal Aviation Act were referred to the Director of the Bureau of Enforcement, the fact remains that the Board made findings as to the operations of both ASA and Wien on the North Slope in conjunction with its finding of the limited scope of ASA's exemption. These factual findings were unnecessary to an interpretation of ASA's operating authority and shifted the focus of the proceeding from interpretation to adjudication.
 
 
 48
 The nature of the proceeding is perhaps best defined by reference to the petition of Wien, which initiated the proceeding. As the Board stated in its Order 75-6-93, Wien alleged that ASA had initiated weekly charter service between Anchorage and Prudhoe Bay/Sag River on February 3, 1975, and "that this operation (was) not authorized by the Board by certificate authority or otherwise and therefore (was) being conducted in violation of the Act". Wien further alleged, according to the Board, "that any authority held by ASA which could be construed to permit the operation of unlimited charter services in the market in question . . . could no longer be considered valid in light of the changed character of ASA's operations." These allegations clearly contemplated violations of the Federal Aviation Act by ASA, thus coming within the purview of § 1482(a). This conclusion is further supported by the statement of the Board near the end of Order 75-6-93 that the case appeared to be "an isolated instance of abuse prompted in part by the transportation preferences of those companies presently exploring the oil fields on the North Slope. . . ." This statement evidences the Board's consideration of ASA's alleged violation of its operating authority.
 
 
 49
 Wien sought a declaratory order or an order revoking or amending ASA's exemption authority to prohibit the operation of charter services by ASA in the Anchorage-Prudhoe Bay/Sag River market. While the relief sought was not punishment, as the CAB correctly notes, the relief sought and granted was nonetheless of the type contemplated by § 1482(c), which allows the Board, upon finding a violation, to issue "an appropriate order" to compel compliance with the Act. Order 75-6-93 appears to us to have been such an order.
 
 
 50
 We view the proceeding to be one substantially within the ambit of § 1482(a). The framing of the petition, the nature of the relief requested, and the matters considered by the Board indicate a proceeding directed toward interpretation of ASA's exemption authority, investigation of its activities in the North Slope market, and issuance of appropriate orders terminating any of its operation conducted in excess of its exemption authority. As a § 1482(a) proceeding, the Board was required by § 1482(c) to give the parties notice and afford an opportunity for a hearing. We further hold that the hearing must be an evidentiary one, permitting each party to present and challenge evidence. Having itself interjected factual issues into the proceedings, the Board should have held an evidentiary hearing in order to insure their proper resolution.II. THE CAB'S ORDER
 
 
 51
 Having determined that the CAB erred by failing to afford the parties an opportunity for an evidentiary hearing, we need not, and do not, decide the issue of the reasonableness of the CAB's order and whether it was supported by substantial evidence.
 
 III. CONCLUSION
 
 52
 In summary, we hold that an evidentiary hearing was required with respect to the scope of ASA's exemption authority and the nature, scope, and effect of its charter operations in the Anchorage-Prudhoe Bay/Sag River market. We conclude that (1) ASA had a "legitimate claim of entitlement" to its exemption authority and that due process required a hearing to permit it to "vindicate its claim"; (2) the proceeding was adjudicatory in nature, involving the resolution by the CAB of disputed issues of fact, as well as the interpretation of the exemption; and (3) the proceeding before the CAB was one substantially similar to that contemplated by § 1482(a) and therefore required an opportunity for hearing as provided by § 1482(c).
 
 
 53
 Accordingly, we remand the case to the Board for further proceedings consistent with this opinion.
 
 
 
 *
 Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970)
 
 
 [1]
 The petitions of BP and ASA were consolidated on this appeal by order of this court dated July 21, 1975
 
 
 [2]
 ASA and Pacific Northern Airlines, Inc. (PNA) were the only carriers ever exempted from the restrictive definition of Alaskan air carriers. When PNA was later acquired by Western Airlines, its exemption terminated. ASA, as a result, is the only air carrier which by exemption from the restrictive definition has the privilege of conducting off-route charter services within Alaska
 
 
 [3]
 Wien had been serving Prudhoe Bay since 1968 pursuant to an exemption of the certification requirement of the Act. Order 68-11-108 (November 22, 1968). Wien's exemption application stemmed from the need of the oil companies then developing the oil field
 
 
 [4]
 This intensification of production activity came in response to passage of the Trans-Alaska Pipeline Authorization Act, which assured a viable means of transporting North Slope oil and presented a scheduled completion date for its production facilities of mid-1977
 
 
 [5]
 MEC has intervened in behalf of the petitioners to regain the lost job opportunities and to prevent the termination of ASA's operating base at Anchorage (which would require the transfer of 15 pilots from Anchorage to Seattle) flowing from the CAB's order
 
 
 [6]
 ASA also filed a motion to stay the orders, which was denied by this court
 
 
 [7]
 MEC contends that it should have an opportunity to present evidence with respect to the effect of the CAB order on flight personnel which the CAB did not consider as an issue in its decision
 
 
 [8]
 It is true, as CAB noted, that these cases involved interests which the agency or court had no discretion to deny if the claimant proved certain facts, whereas this case involves an exemption which was issued at the discretion of the Board. While the factual contexts are different, in our opinion the legal principles with respect to property interests set forth in these cases are of general application
 
 
 [9]
 As ASA notes in its brief, the exemption granted ASA, unlike the typical exemption, is without limitation no termination date is set and the traditional phrase, "This exemption may be revoked without notice or hearing", is not included
 
 
 [10]
 ASA, since the granting of its exemption and amendment of § 292.2, has conducted other charter operations similar to that with BP, with the approval of the CAB. For instance, subsequent to 1959, ASA operated approximately 500 charters carrying passengers and cargo over a four and one-half year period between Anchorage and Amchitka in the Aleutian Islands for a single charterer. At that time that market was receiving regularly scheduled service by a certificated carrier, Reeve Aleutian Airways, Inc. While there is no indication that these charters were "regular and frequent", they nevertheless indicate a substantial amount of charter activity over the route of a certificated carrier
 A second instance was in 1969, during the North Slope oil boom, when ASA alleged that it operated thousands of charter flights in the Anchorage/Fairbanks North Slope market, then being provided with scheduled service by Wien.
 
 
 [11]
 "Adjudicative facts are the facts about the parties and their activities, businesses, and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy discretion." 1 Davis, Administrative Law § 7.02 at p. 413 (1958)
 
 
 [12]
 The nature of these two functions was defined in the Attorney General's Manual on the Administrative Procedure Act (1947) at 14-15:
 "The object of the rule making proceeding is the implementation or prescription of law or policy for the future, rather than the evaluation of a respondent's past conduct . . . Conversely, adjudication is concerned with the determination of past and present rights and liabilities. Normally, there is involved a decision as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action." 359 F.2d 624 at 629.
 
 
 [13]
 Subpart B of Part 302 of the Board's regulations (14 C.F.R. §§ 302.200-. 218) governs the manner in which the Board must proceed when determining if there has been a violation of the Federal Aviation Act or any requirement established pursuant thereto
 
 
 [14]
 The CAB ordered Wien's allegations that ASA's charter flights for BP were not bona fide single-entity charter flights and that BP was acting as an indirect air carrier referred to the Director of the Bureau of Enforcement