**Steven R. GRAYSON, Petitioner–Appellant,**

**v.**

**Richard H. RISON, Warden; David Crouse; Wayne Adams; Walt Bunselmeyer, et al., Respondents–Appellees.**

**No. 89–56188.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1991.

Decided Sept. 11, 1991.

Frank C. Cardenas, Carl D. Michel, O'Melveny & Myers, Los Angeles, Cal., for petitioner-appellant.

Lourdes G. Baird, Leon W. Weidman, Michael C. Johnson, U.S. Attorney's Office, Los Angeles, Cal., for respondents-appellees.

Before POOLE, KOZINSKI and LEAVY, Circuit Judges.

KOZINSKI, Circuit Judge.

Grayson, a former federal prisoner, brought a *Bivens* action against three prison officials seeking damages for an allegedly unlawful transfer between prison facilities.

### Facts

Grayson spent twenty-nine days at Terminal Island Federal Correctional Institution (FCI) in the summer of 1984. As a result of his conviction for mail and securities fraud, he had become not only a federal prisoner, but also a civil defendant. He was sent to Terminal Island in this latter capacity—in order to be deposed—and returned to his usual FCI when the depositions were completed. Because he was only visiting Terminal Island, he was classified as a "holdover." [1]

While at Terminal Island, Grayson was housed in what is known as the jail (or J) unit, as were all holdovers. Prisoners held in the J-unit were separated from the general prison population for various disciplinary and administrative reasons. Some quarters within the unit were less restrictive than others. Holdovers were assigned

---

1. Grayson was normally held at Safford FCI, where he had been transferred as a result of disciplinary problems at another institution. He was to return to Safford after his stay at Terminal Island. All inmates are considered holdovers when they are held pending transfer to a designated institution.

first to J–1, where they had limited access to common areas within the unit but could not leave the unit. If space was available and they were able and willing to work, they could later be assigned to less restrictive living quarters (J–4 or J–5) where they were permitted to mingle with the general prison population. If problems developed with this placement, prison policy was to place holdovers back in J–1 administratively, without setting in gear the disciplinary machinery.

Grayson was transferred from J–1 to J–5 a few days after his arrival. At that point things went downhill: Foot problems prevented him from wearing the safety shoes required for working; he started complaining that the kosher kitchen had inadequate cookbooks; he found the prison staff to be uncooperative. After about a week he stopped working. Whether or not this was the result of bad feet, a bad attitude or both is unclear. He was soon transferred back to J–1; it is this transfer of which Grayson complains.

Grayson claims that prison officials transferred him back to J–1 to punish him for being disruptive. Respondents do not dispute that Grayson was disruptive and that this influenced their decision to move him back to a more secure area. However, they claim that no process was due because the transfer was an exercise of administrative authority, not a punitive action. The district court granted respondents' motion for summary judgment on all claims based on a finding of qualified immunity, and Grayson appeals.

### Discussion

Grayson claims that the transfer from J–5 to J–1 violated federal prison regulations as well as due process. We address each of these theories in turn.

#### I

■ A. Grayson first claims that his transfer from J–5 to the more restrictive J–1 violated federal prison regulations, which are found in 28 C.F.R. § 541. He contends that this transfer placed him in "disciplinary segregation," and therefore could only be accomplished after notice and a hearing.[2] He cites section 541.21(a), which defines disciplinary segregation as "a special housing unit ... separated from the general population [where the prisoner has] significantly fewer privileges than those housed in administrative detention." Grayson argues that prison officials removed him from the general prison population and placed him in disciplinary segregation when they transferred him from J–5 to J–1, because J–5 inmates were allowed to mingle with the general prison population while J–1 inmates were not.

Grayson's argument fails for a very fundamental reason: He was never part of the general prison population, as he was always housed in the J-unit, and this entire unit was separated from the general prison population. That J–5 inmates were allowed to mingle with the general prison population during the day does not mean that they became a part of it. Therefore, Grayson could not have been removed from it by his transfer to J–1.

■ B. Even if he was not entitled to notice and a hearing *before* this transfer, Grayson claims he was at least entitled to a memorandum detailing the reasons for his placement and formal post-transfer review, because he was placed in "administrative detention."[3] The regulations define administrative detention as "the status of confinement of an inmate in a special housing unit ... which serves to remove the inmate from the general population." Section 541.22. Grayson claims that because his transfer took away his access to the general population, it at least amounted to administrative detention.

This argument fails for precisely the same reason as the previous one: Grayson was never removed from the general prison

---

**2.** Sections 541.17(a) and 541.20(a) provide that an inmate is entitled to notice and a hearing before being placed in disciplinary segregation.

**3.** Section 541.22 requires that prison officials provide inmates with a memorandum and formal review after they are placed in administrative detention.

population because he was never a part of it. Thus, he was not placed in administrative detention by his move back to J–1.

■ In fact, as section 541.22 defines his status, Grayson was always in administrative detention. His initial placement in the J-unit, separated from the general prison population, amounted to just that. Because he was placed in the J-unit due to his status as a holdover, he was not entitled to the memorandum and formal review otherwise required by section 541.22: Section 541.22(b) provides an exception to these requirements when placement "is a direct result of the inmate's holdover status."[4]

## II

Having concluded that Grayson was not entitled to any procedural safeguards under federal prison regulations, we must determine whether he was entitled to such safeguards as a matter of due process.

■ A. In a nutshell, Grayson's argument is that, even if the prison officials were entitled under the regulations to transfer him from J–5 to J–1 without procedural safeguards, he was nevertheless entitled to such safeguards as a constitutional matter because the action was taken to punish him. In addressing this claim, we are guided by the Supreme Court's opinions in *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), and *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

In these cases the Court held that state prisoners' due process rights were not violated when they were transferred to less favorable prisons, even for reasons labeled punitive or disciplinary, or resulting from a prisoner's misbehavior. "Crucial to these decisions was the Court's conclusion that the relevant state statutes, regulations and customs did not give rise to any justifiable

expectation on the part of prisoners that they would not be transferred for any reason or no reason." *Hayward v. Procunier*, 629 F.2d 599, 601 (9th Cir.1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981). The prisoners had no right to be at any particular prison, and transfers were not limited to instances of misconduct; they were left to the discretion of prison officials.

Such is the situation here. Grayson could have no "justifiable expectation" of being anywhere but in administrative detention. *See* 28 C.F.R. § 541.22(a) (holdovers may be held in administrative detention pending transfer to another institution). Whether administrative detention meant placement in J–1 or J–5 was left to the discretion of prison officials. *See Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983) (prison officials have broad administrative and discretionary authority). The warden's policy did not condition moves back to J–1 on incidents of misconduct or other specified events; it was entirely a matter of administrative discretion.

■ When prison officials have legitimate administrative authority, such as the discretion to move inmates from prison to prison or from cell to cell, the Due Process Clause imposes few restrictions on the use of that authority, regardless of any additional motives which are claimed to exist.[5] It doesn't matter what label is placed on the action or what other reasons may be behind it; nor is it relevant that the conditions of confinement may become less pleasant as a result. We must allow prison officials the freedom to exercise their administrative authority without judicial oversight. Some administrative actions will inevitably make prisoners feel cheated; nevertheless, this does not give them a federal cause of action. *See Fano*, 427 U.S. at 225, 96 S.Ct. at 2538.

---

**4.** However, as a holdover Grayson was entitled to weekly review of his status under section 541.22(c)(2). He does not claim that this section of the regulation was violated.

**5.** In *Redman v. County of San Diego*, 942 F.2d 1435, 1440 n. 7 (9th Cir.1991) (en banc), we said: "[T]he state's failure to protect [convicted

prisoners] against assaults by other prisoners results in a constitutional violation when that failure constitutes deliberate indifference to their safety." Appellant makes no allegation that prison officials were deliberately indifferent to his safety.

## Conclusion

We affirm the district court's grant of summary judgment.[6]

AFFIRMED.

---

6. Grayson's complaint also alleged violations of his First and Eighth Amendment rights. Essentially, he claims he was transferred in order to prevent him from communicating with people outside and associating with people inside the prison, and that this transfer amounted to cruel and unusual punishment. We agree with the district court that these claims are meritless.