629 F.2d 599
 Art HAYWARD, Jr., Michael McNabb and Morris L. Brown,
Plaintiffs/Appellants,
v.
Raymond K. PROCUNIER, Jiro J. Enomoto, Walter Britt, Robert
M. Rees, L. H. Fudge, C. L. Swagerty, D. W. Smith
and Don R. Weber, Defendants/Appellees.
 No. 78-3701.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 9, 1980.
Decided Oct. 3, 1980.
 
 Robert A. Goodin, Armour, St. John, Wilcox & Goodin, San Francisco, Cal., for plaintiffs/appellants.
 Karl Mayer, San Francisco, Cal., for defendants/appellees; Kenneth C. Young, Thomas P. Dove, Deputy Attys. Gen., San Francisco, Cal., on brief.
 Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY, TANG and CANBY, Circuit Judges.
 CANBY, Circuit Judge.
 
 
 1
 In this appeal we must decide whether state prisoners' constitutional rights to procedural due process and freedom from cruel and unusual punishment were violated by a five-month "lockdown"[1] of the prison. The district court held that there was no constitutional violation. We agree and affirm.
 
 FACTS :
 
 2
 Between 1970 and 1974 California's San Quentin Prison became an increasingly turbulent institution. The rate of violent incidents more than tripled during this period, and the influence of prison gangs steadily grew. 1974 was a particularly violent year. There were 82 assaults with weapons and 12 killings, as well as 71 cases of possession of weapons and 2 attempted escapes. Prison officials responded to the problem by temporarily "locking down" the prison several times in 1974; Department of Corrections officials even considered closing San Quentin.
 
 
 3
 On December 19, 1974, two men were killed in separate incidents of gang violence. Prison officials feared that the violence might spread. The warden decided that a state of emergency existed and, acting pursuant to § 4402 of the California Rules and Regulations of the Director of Corrections, he imposed a lockdown on the entire prison.
 
 
 4
 At first the prisoners were confined to their cells 24 hours a day and were served sack lunches twice a day in their cells. Gradually, however, the regimen was relaxed. Within two weeks the prisoners received one hot meal per day in the dining room. Two weeks later they received two hot meals per day and finally in June 1975, six months after the lockdown began, the normal routine of three hot meals per day was restored. Similarly, yard exercise and trips to the showers were forbidden entirely at the outset of the lockdown, but were gradually reintroduced. Showers were fully reintroduced by February 1975. Some yard exercise was permitted within a month after the lockdown began, and the normal exercise routine was restored by May. Of course a great many inmate privileges such as movies, school attendance and visitation were partially or wholly abrogated during the five to six months of the lockdown.
 
 
 5
 The plaintiffs in this action were residents of East Block, one of the four major housing units at San Quentin, during the lockdown. They brought this action on behalf of themselves and the class of East Block residents for damages and declaratory and injunctive relief under 42 U.S.C. § 1983. They do not argue that the initial decision to impose the lockdown was necessarily improvident; indeed, the record discloses that many inmates were urging the warden to lockdown the prison after the two killings on December 19, 1974. They do, however, urge that continuance of the lockdown for more than a short time without some sort of notice and hearing at which the inmates could participate deprived them of their liberty without procedural due process, in violation of the fourteenth amendment. The prisoners also argue that the lockdown, continuing as long as it did, constituted cruel and unusual punishment in violation of the eighth and fourteenth amendments. The district court rejected these claims and the prisoners appealed.
 
 PROCEDURAL DUE PROCESS :
 
 6
 In Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Supreme Court held that state prisoners had not lost any liberty or property interest, and hence were not entitled to procedural due process, by being transferred to a less favorable prison within the same prison system. Crucial to these decisions was the court's conclusion that the relevant state statutes, regulations and customs did not give rise to any justifiable expectation on the part of prisoners that they would not be transferred for any reason or no reason. Had the state law been to the contrary, it was possible that inmates would have had a liberty interest in not being transferred which could not have been abridged without procedural due process.
 
 
 7
 The prisoners in this case argue that, unlike the inmates in Meachum and Montanye, they did have a legitimate expectation under California law and prison custom that they would not be subjected to a lockdown unless a certain specified condition-the existence of an emergency-was met. They argue that they were therefore entitled to a hearing before an impartial fact-finder at some point soon after the lockdown was imposed.
 
 
 8
 We have difficulty finding support for the plaintiffs' contentions in the California prison regulations or practices. Section 4402 of the Rules and Regulations of the Director of Corrections simply provides that "(e)ach institution head must have in effect at all times a plan, approved by the Director, for meeting emergencies, such as riots, strikes, attacks upon inmates, visitors or staff, explosions or fires, suicides or attempted suicides or accidental injuries to inmates or visitors and employees." The variety and inclusiveness of this list suggest that the regulation is not intended to impose fixed conditions upon the warden's exercise of his authority. In any event, it is undisputed that there were "attacks upon inmates" which led the warden to implement the prison's Disturbance Control Plan and impose the lockdown. We do not understand the prisoners to be seeking a hearing merely to determine whether in fact such attacks took place. They wish a hearing to determine whether the increased level of security represented by the lockdown was justified by the emergency. Yet nothing in the regulations nor, in our view, in the customs of the prison is sufficiently specific to create a justifiable expectation of any particular level of prison-wide security. That omission distinguishes the present case from those in which prisoners were held to be entitled to procedural due process. We do not find here the equivalent of a statute conferring a particular benefit, such as good behavior time or parole, with a specification of conditions under which that benefit can be lost. See Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). The regulations here do not purport to enumerate specific reasons for which a prisoner can be placed in solitary confinement and to require documentation of those reasons. See Wright v. Enomoto, 462 F.Supp. 397 (N.D.Cal.1976), aff'd mem., 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). Nor are prisoners being subjected to treatment wholly outside the foreseeable consequences of criminal conviction, such as commitment to a mental institution in the absence of a mental disease or defect. See Vitek v. Jones, --- U.S. ----, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Here we have only a regulation requiring a warden to have a plan for meeting emergencies, along with a non-exhaustive list of possible emergencies.
 
 
 9
 It is certainly true that in the ordinary course of events prisoners expect that there will be no lockdowns in the absence of an emergency, just as in Meachum and Montanye prisoners naturally expected that they would not be transferred in the absence of misconduct, "unless it be assumed that transfers are mindless events". 427 U.S. at 228, 96 S.Ct. at 2540. But the Supreme Court found that type of expectation to be too ephemeral to give rise to a due process liberty interest, and we think the same conclusion follows in the present case.
 
 
 10
 There is another fundamental defect in the procedural due process arguments of the prisoners, and it lies in the nature of the hearing they seek. In every case cited by plaintiffs or revealed by our research in which prisoners were found to be entitled to a due process hearing, the subject of that hearing was the fate of individual prisoners, and the facts to be examined dealt with their conduct or their condition. See, e. g., Wolff v. McDonnell, supra; Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, supra; Wright v. Enomoto, supra. In this case, however, the facts in dispute are not those which would differentiate the plaintiffs from the general prison population and cause them to be subjected to distinctive treatment. The conduct of the plaintiffs is not in issue. Instead, the question to be decided is whether the degree of emergency justifies a continuation of the lockdown-a determination involving a high degree of policy and prediction. See Gilliard v. Oswald, 552 F.2d 456, 459 (2nd Cir. 1977). To address this question, the plaintiffs urge us to fashion a hearing at which selected members of the inmate population can present their views on the advisability of a lockdown. Both the subject matter and the suggested procedure cause us to doubt that the Constitution requires any such hearing. See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); Alaska Airlines, Inc. v. Civil Aeronautics Board, 545 F.2d 194, 200 (D.C. Cir. 1976).
 
 
 11
 Plaintiffs rely on three cases involving procedural due process and lockdowns. All three were decided before Meachum and Montanye, supra, and in none of them was a due process hearing actually ordered. The case most supportive of plaintiffs is Labatt v. Twoomey, 513 F.2d 641 (7th Cir. 1975). There the Court held that a nine-day lockdown did not implicate due process because it was short and in response to an emergency. The court stated, however, that in some cases of a general lockdown the Constitution would require that the prisoners be given "notice of the cause of the deprivation, the reasons for its continuation, and an opportunity to respond." Id. at 646. The second case, Hoitt v. Vitek, 497 F.2d 598 (1st Cir. 1974) is more equivocal. The court held that there was no procedural due process violation in a lockdown of several weeks' duration, but added that in the event of a long and unreasonable lockdown the prisoner could properly seek an injunction, or even damages if "the confinement was being continued in bad faith as a subterfuge for the denial of prisoners' procedural rights." Id. at 600. We do not necessarily read that language as an endorsement of plaintiffs' position but in any event we are not persuaded by it or by the dictum in Labatt that we should interpret the due process clause to require the type of hearing sought by the prisoners in this case. Our position is supported by Gilliard v. Oswald, 552 F.2d 456 (2d Cir. 1977) in which the court rejected a claimed right to hearing of 140 prisoners administratively confined to their cells because of a prison emergency arising from a series of assaults.
 
 
 12
 The third lockdown case upon which plaintiffs rely, Johnson v. Anderson, 370 F.Supp. 1373 (D.Del.1974) is also in accord with our views. There the court held that a lockdown of an entire cell block did not implicate procedural due process because the lockdown decision was "a rule change of general applicability affecting an entire class of prisoners. Since such a rule change is not directed at particular persons, individual prisoners are neither more acutely affected by it than other members of their class nor uniquely able to bring personal knowledge to bear on the appropriateness of its implementation." Id. at 1382. The same reasoning applies with even greater force to the lockdown of an entire prison.
 
 
 13
 We therefore hold that there is no due process right to the hearing sought by plaintiffs in this case. In so deciding we do not minimize the seriousness of a lockdown nor do we deny that administrative review of a lockdown decision might be desirable. See McGruder v. Phelps, 608 F.2d 1023 (5th Cir. 1979). We are simply unable to say that the Constitution dictates such a procedure.
 
 EIGHTH AMENDMENT :
 
 14
 Prisoners are not left without any remedy against an unjustifiable or unduly oppressive lockdown. Severe conditions of confinement are subject to eighth amendment scrutiny, which plaintiffs have invoked in this proceeding. They claim that the lockdown constituted cruel and unusual punishment, and rely primarily on Jefferson v. Southworth, 447 F.Supp. 179 (D.R.I.1978), aff'd, 616 F.2d 598 (1st Cir. 1980). In that case, however, the district court was faced with a prison administration which was either unable or unwilling to deal with extreme conditions which the court had previously found to be cruel and unusual punishment. Palmigiano v. Garrahy, 443 F.Supp. 956 (D.R.I.1977), aff'd, 616 F.2d 598 (1st Cir. 1980). The Director of Corrections in Jefferson imposed the lockdown within a few weeks of the district court's decision in Palmigiano and apparently in response to it. There was, the district court found, no emergency necessitating the lockdown and the Director had announced his intention to continue the lockdown indefinitely. Neither the extreme conditions of Palmigiano nor the apparent bad faith of prison authorities in Jefferson v. Southworth find a parallel in our case.
 
 
 15
 Nor do the conditions imposed during the emergency lockdown at San Quentin fall within our ruling in Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979). In Spain we affirmed a decision of a district court that confinement of six prisoners with an almost total absence of outdoor exercise was cruel and unusual punishment, and we upheld the court's order requiring at least one hour of such exercise per day, five days per week "unless inclement weather, unusual circumstances, or disciplinary needs made that impossible." Id. at 199. The present case, however, confronts us with the unusual circumstances reserved in Spain; this lockdown was in response to a genuine emergency. The measure was temporary and plaintiffs here were allowed approximately the minimum exercise mandated in Spain within a month after the imposition of the lockdown. Other restrictions were eased as the prison administration determined that the emergency permitted. These decisions are delicate ones, and those charged with them must be given reasonable leeway. See Hoitt v. Vitek, 497 F.2d 598, 601 (1st Cir. 1974); Gilliard v. Oswald, 552 F.2d 456, 459 (2nd Cir. 1977). The court below carefully reviewed the restrictions of the lockdown in light of the emergency at the prison and determined that they did not cross the eighth amendment line. We agree with that conclusion.
 
 
 16
 Affirmed.
 
 
 
 [1]
 "Lockdown" is not a term of art. It generally refers to a condition of abnormally heightened security during which prisoners are confined to their cells totally or for a much greater portion of the day than usual. As will be seen, the restrictive incidents of the lockdown in this case changed during the period it was in effect