**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVE JOSEPH NOBLE, IV,
*Plaintiff-Appellee,*

v.

D. ADAMS; D. CUEVAS,
*Defendants-Appellants.*

No. 09-17251

D.C. No.
1:03-cv-05407-SMS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, Chief District Judge, Presiding

Submitted February 15, 2011*
San Francisco, California

Opinion Filed March 17, 2011
Amended Opinion Filed August 2, 2011

Before: John T. Noonan, Diarmuid F. O'Scannlain, and
Stephen S. Trott, Circuit Judges.

Opinion by Judge Trott

---

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

9861

.

## COUNSEL

Constance L. Picciano, Deputy Attorney General, Sacramento, California, for the appellants.

Steve Joseph Noble IV, Pro Se, Represa, California, for the appellee.

## ORDER

With the filing of the Amended Opinion, Pro Se Appellee's petition for rehearing filed April 8, 2011, is hereby DENIED, no further petitions for rehearing will be accepted.

## OPINION

TROTT, Circuit Judge:

Adams and Cuevas are prison officials responsible for a post-riot lockdown of Corcoran State Prison in California. They appeal the district court's denial of their assertion of qualified immunity against inmate Noble's claim that the lockdown resulted in a denial of his Eighth Amendment right to outdoor exercise. We have jurisdiction over this timely appeal, and we reverse and remand with instructions to enter judgment in favor of the officials.

### BACKGROUND

During 2002, Noble was a prisoner in the Substance Abuse Treatment Center ("SATF") at Corcoran State Prison. He is an African-American who was also a "former" street gang member from Los Angeles — a "Crip." Noble was classified as a "Level IV" inmate, the highest level of custody, and he was housed in Facility C.

Because of a particularly violent armed riot on Facility C's exercise yard by African-American prisoners against staff on January 09, 2002, described by the Facility Captain of SATF as the most violent and savage attack he had observed in 20 years, Warden D.G. Adams of the SATF formally declared a state of emergency (approved by the Director of Corrections) and imposed a "lockdown" on the entire prison.[1] The riot in

---

[1] Cal. Code Regs. 15, § 300 defines a lockdown as follows:

Lockdown means that a portion of the facility is affected by sus-

the exercise yard, which was started by a Crips gang member, included an attempt by prisoners to kill one of the correction officers and resulted in injuries to 21 staff. Nine staff members were taken to the hospital for evaluation and treatment. The mass assault on staff was an unprecedented event. It was unusual because of the normally antagonistic gangs acting together. The Facility Captain said that this attack on staff was a "life changing event." According to Noble, "Numerous inmate manufactured weapons were found [after the January, 2002] riot on the Fac. 'C' exercise yard." Noble concedes that Crips directly participated in the attack.

This violent riot occurred only one day after a previous prison-wide lockdown had been lifted, a lockdown caused by intermittent prisoner riots during 2001. Those riots, which involved Hispanic groups, created tension between prison staff and African-American inmates because the latter felt they were being arbitrarily punished for the acts of other groups. As recognized by the district court, "African-American inmates at SATF were dissatisfied with the way they were treated and became openly defiant of authority by being deliberately slow to obey orders or submit to searches."

The lockdown resulted in the curtailment of outdoor exercise and all regular privileges for all prisoners, including Noble. Because the inmates had directed their attack against staff, increased tension between inmates and staff was a serious concern to those responsible for the safety and security of the prison.

---

pension of required programs or services, and inmates are not released except as determined by the facility administration on an individual, case-by-case basis. As determined by the facility administration, under such circumstances only critical inmate workers in the affected housing units/sub-facilities will be permitted to attend to work assignments under escort, and all but essential functions are suspended in those affected housing units or sub-facilities, e.g., yard, canteen draws, religious services, and visiting.

Three months later, prison officials gradually and in measured stages began to resume normalcy. The first step in the process was instituted on April 11, 2002: African-American and white inmates were permitted to have contact visitation with outside visitors. According to prison officials, after it was demonstrated to their satisfaction that the controlled visiting program was successful, a modified day room access program was instituted on June 14, 2002. On June 25, non-gang affiliated African-American inmates were included in the day room access program.

On June 27, defendant Cuevas met with selected African-American inmates to discuss modifications to the lockdown. The purpose of this meeting was to notify the inmates in Facility C about plans gradually to restore privileges and normalcy. As reflected in a synopsis of the meeting, the selected inmates were told that if the opening of the day room "runs smoothly then dayroom will be open for the remaining black population. If dayroom program is disruptive program [sic] will stop until further notice." In response to an inmate inquiry as to why the day room was not open to all black inmates, Captain Cuevas's answer was, "Most of the incidents on Facility C have involved black affiliated gang members. Start programming with the ones who are not involved, the fairest way. The dayroom will open with nonaffiliated black gang members. Once that shows promise, dayroom will be open for the affiliated black gang members." He added that opening up the day room for African-Americans not affiliated with a gang was a "stepping-stone," and that the plan of action in place depended upon "behavior," which, if positive, would occasion more privileges. At the conclusion of the meeting, one of the inmates advised Captain Cuevas that he was "worried that this is going to fall through."

On July 8, 2002, all African-American inmates — including gang affiliates were allowed access to the day room program. Finally, on August 1, 2002, all inmates in Facility C were given access to a modified program for outdoor exercise.

The next day, as Noble concedes, another riot occurred, this time involving Hispanic prisoners. As a result, full exercise privileges were not restored until April 1, 2003. These facts are beyond dispute.

Captain Comfort, the Facility C official responsible for determining when the lockdown could be lifted, offered this unchallenged explanation of the rigor of this task:

> The primary goal of any lockdown, including the one imposed on January 9, 2002, is to determine when it is safe to release the inmates to normal programming. This is not a determination that is easily made, and the consequences for making a mistake can be the resumption of violence, with injuries to inmates and staff. . . . The investigation of a major incident, including this one, is a long process, complicated by many factors. Initially inmates will not talk to staff, because of the anger, and hostility generated by the incident itself.

Captain Comfort also explained that the general security characteristics of inmates housed in Facility C factored into the officials' decisionmaking process. "Level IV is the highest [security] level that can be assigned to a general population inmate. . . . The majority of [Facility C inmates] are there because they have demonstrated through their institutional behavior that they need higher levels of custodial supervision than other Level IV inmates."

## THE LAWSUIT

Noble, who has not been shown to have participated in the January, 2002 riot, sued pursuant to 28 U.S.C. § 1983 *inter alia* for alleged violations of his Eighth Amendment right to outdoor exercise. *See Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). The focus of his claim covers the period beginning

with the January 9, 2002 riot, and ending April 1, 2003. This appeal comes from the district court's denial of the prison officials' motion (1) for summary judgment on the merits, and (2) for qualified immunity asserted on the ground that a prisoner's right to outdoor exercise during a lockdown imposed in the aftermath of a prison riot was not "clearly established" in 2002.

**[1]** Here, the appellant-officials argue that the law concerning the provision of outdoor exercise under the particular circumstances of this case was not so clearly established that reasonable prison officials acting in their place would have been on notice that their actions violated the commands of the Eighth Amendment. They point out that there is no controlling case that specifies how long a lockdown can be continued before it trespasses upon the right in question, or what the monitoring process must be in order for the lockdown to remain in place. The officials rely in the main on *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010), which held that a prisoner's right to outdoor exercise is neither absolute nor indefeasible in the light of prison violence. *Id.* at 1068-69.

Noble on his part defends the district court's decision and asks us to dismiss the appeal as untimely, a motion which a Ninth Circuit motions panel denied without prejudice.[2] On the merits, Noble relies primarily on *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980), and *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982).

## QUALIFIED IMMUNITY

The district court denied the officials' motions because it "could not find [from the officials' submissions] that a legiti-

---

[2]We deny this "motion to dismiss." The district court's denial of the motion for qualified immunity was not a judgment controlled by F.R.A.P. 4(a)(4)(A)(vi). Here, the defendants' notice of appeal was properly filed within 30 days of the denial of their motion for reconsideration.

mate penological purpose existed" for the lockdown beyond January 30, 2002, when the "investigation of the riot, which was the basis of the lockdown, appears to have been completed . . . ."

The court said in its Order Denying Reconsideration that it simply couldn't figure out from the record "whether there were other factors which necessitated the continued lockdown, or whether the defendants considered allowing inmates access to the exercise yard." The court also said that "circumstances may justify long-term outdoor exercise deprivation *if* the defendant provides evidence of the reason for the deprivation," which the court found lacking in this record.

In an earlier order regarding summary judgment, the court spelled out its specific concerns as follows:

> In this case, the court finds that the deprivation of exercise for the seven month period is sufficiently serious to meet the objective component of an Eighth Amendment violation. The issue remaining is whether Defendants were deliberately indifferent to Plaintiff's needs during this time period. This is especially true given the limited information Defendants have provided regarding whether the restriction in exercise bore an attempt to ease the emergency, and whether the restriction had a penological purpose.

> In its previous order, the court noted that Defendants had not provided "specific facts concerning what was done in the investigation from January 9, 2002 to July 31, 2002, to demonstrate that the restriction to the exercise yard had a penological purpose that would warrant a deprivation of exercise for nearly seven months." For example, it was not clear on what day the investigation was concluded, or why this particular investigation took several months to

complete. Furthermore, there was no explanation of why privileges were restored in the order that they were given, or why officials felt that allowing prisoners access to the exercise yard would pose a danger to the safety of the institution for the seven month period from January 9, 2002 to August 1, 2002.

Counterintuitively, the district court granted qualified immunity to these officials for the period running from August 1, 2002 through April 1, 2003 "after . . . the decision was made [by the officials on August 1] to open the exercise yard to all inmates on a modified program that entailed releasing one building at a time to the [exercise] yard on a rotational basis." The reason given by the district court for this decision was the occurrence of new disruptive prisoner incidents in the yard, one involving African-American inmates and a battery against a police officer.

We conclude pursuant to what is now known as prong 2 of the *Saucier v. Katz*, 533 U.S.194 (2001) test, *see Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 821 (2009), that it was not clearly established in 2002 — nor is it established yet — precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot, here one in which inmates attempted to murder staff.

**[2]** According to *Norwood*, we defer to prison officials' *judgment* so long as that judgment does not manifest either deliberate indifference or an intent to inflict harm. California Code of Regulations title 15, § 3383 ("Code") says in relevant part that

> [d]uring a state of emergency, the cause and effect shall be constantly reviewed and evaluated by the institution head. . . . The facility's affected areas,

programs, and operations shall be returned to normal *as soon as the institutional head . . . determines that it is safe to do so*. (Emphasis added).

On this precise issue, prison officials are entitled to " 'wide-ranging deference.' " *Norwood*, 591 F.3d at 1069 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

Norwood, who was not a gang member, was imprisoned at the California State Prison at Sacramento. Because of prison violence, which included violent attacks by Crips on staff, he endured "four separate extended lockdowns over the course of two years." *Norwood*, 591 F.3d at 1065. In total, he was denied exercise during this period for over twelve months in increments of three, three, four and a half, and two months. A jury concluded that these denials violated Norwood's Eighth Amendment right to outdoor exercise, but awarded him only $11 in nominal damages and $39,000 in punitive damages. *Id.* at 1066. Not only did we reverse the judgment in Norwood's favor because of erroneous jury instructions, but we declined to remand for a new trial. Instead, we concluded on the record that the officials were entitled to qualified immunity and remanded instead for entry of judgment on their behalf. In so doing we said, "We decline Norwood's invitation to micro-manage officials whose expertise in prison administration far exceeds our own . . . ." *Id.* at 1070.

[3] We reversed the district court's merits judgment in favor of Norwood because of the court's refusal to give to the jury the following instruction:

> In considering whether defendants were deliberately indifferent to the need for outdoor exercise, the jury should consider that defendants had a competing obligation under the Eighth Amendment to ensure the safety of prisoners, including protecting prisoners from each other. In considering these factors, you should give deference to prison officials in the adop-

tion and execution of policies and practices *that in their judgment* are needed to preserve discipline and to maintain internal security in a prison.

*Id.* at 1066 (emphasis added). We also said in *Norwood* the following:

> [P]rison officials have a duty to keep inmates safe, and in particular to protect them from each other. Officials must balance this imperative against other obligations that our laws impose, such as providing outdoor exercise. When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control. We've explained that "prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost. This is for the benefit of the prisoners as much as for the benefit of the prison officials."
>
> . . .
>
> Such decisions are not to be judged with the benefit of hindsight, in any event. It matters not whether the measures taken actually worked but whether prison officials reasonably believed they would be effective in stopping the violence. At most, prison officials here may be faulted for erring on the side of caution by maintaining lockdowns for longer than necessary. But, when it comes to matters of life and death, erring on the side of caution is a virtue. *Certainly, no officer could reasonably have anticipated that such prudence would be found to violate the Eighth Amendment.*
>
> [W]hen balancing the obligation to provide for inmate and staff safety against the duty to accord

inmates the rights and privileges to which they are entitled, prison officials are afforded "wide-ranging deference." When a "lockdown was in response to a genuine emergency," and "restrictions were eased as the prison administration determined that the emergency permitted," *we may not lightly second-guess officials' expert judgments about when exercise and other programs could safely be restored. "These decisions are delicate ones, and those charged with them must be given reasonable leeway."*

. . .

Attacks on staff are, by their nature, more serious challenges to prison authority than attacks on other inmates.

*Id.* at 1066-70 (emphasis added) (internal citations omitted).

**[4]** Here, following this attack in the exercise yard against prison staff, there is no doubt that the declaration of an emergency and a lockdown for *multiple* security reasons were justified. A lockdown by definition normally precludes the type of exercise Noble says he was denied. Regular operations cease during lockdown and are restored gradually according to prison officials' *judgment* as to the safety of the conditions on the ground.

In its Order of March 25, 2009, regarding summary judgment, the district court listed as undisputed relevant facts the following:

6. After the assault was controlled, numerous inmate manufactured weapons were found in the area of the attack.

7. After the lockdown was imposed, the first priority was the gathering of information and the

completion of the incident report. The report of the January 9, 2002, incident was not completed until January 30, 2002, because of the seriousness of the incident, the number of staff injured, the number of inmates involved, and the number of weapons recovered.

8. Following a major incident such as the January 9, 2002 attack on staff, a lockdown serves a number of purposes. Because both staff and inmates have strong emotional responses to a major incident, the initial phase of a lockdown acts as a "cooling-off" period. With the passage of time, the emotions subside and inmates will become more cooperative, will be more willing to provide information to staff, and more willing to cooperate in resolving whatever conflict exists, whether it is between inmate groups or between inmates and staff.

9. The initial phase of the lockdown of C-Facility also included a thorough search of the entire facility. There are eight housing units, and a thorough search includes searching all inmates, the contents of every cell, all inmate property, and all common areas of the housing unit. A search of a housing unit has to be completed in one day to prevent inmates from moving contraband to an area of the housing unit that has already been searched.

10. The primary goal of any lockdown, including the one imposed on January 9, 2002, is to determine when it is safe to release the inmates to normal programming. This is not a determination that is easily made, and the consequences for making a mistake can be the resumption of violence, with injuries to

inmates and staff. As the Facility Captain, it was R. Comfort's responsibility to provide recommendations to his superior staff concerning the risks posed by releasing inmates from the January 9, 2002, lockdown.

11. The inmates housed in C-Facility had unique characteristics which influenced the decisions regarding the lockdown.

12. The Department of Corrections and Rehabilitation has an objective point scoring system used to determine the level of custody assigned to an inmate. Level IV is the highest level that can be assigned to a general population inmate. The length of an inmate's prison commitment can be a major component of a high classification score, meaning that many inmates who are disciplinary free who have a high point score are classified as Level IV.

13. The Department has two different housing unit designs for Level IV housing. The housing unit in C-Facility is what is called a 180 degree design. The other Level IV design is called a 270 degree design. The 180 degree type of construction provides a high level of observation, and therefore, control over a housing unit. The majority of inmates confined in 180 degree design housing are there because they have demonstrated through their institutional behavior that they need higher levels of custodial supervision than other Level IV inmates.

14. Many of the inmates housed on C-Facility at the time of the January 9, 2002, assault on staff, had been released from a security housing unit, had a history of in-prison violence, or

were gang affiliated. Most of the African American inmates in C-Facility were affiliated with street gangs such as the CRIPS or the Bloods. Therefore, the potential for violence, if the lockdown was released prematurely, is much greater than if C-Facility had been a Level III facility, or even a 270 degree level IV Facility.

15. The ultimate conclusion for the January 9, 2002, attack on staff, more reasonably characterized as staff's "best guess" of the reason, was that inmate Moreno, H-28772, seized an opportunity to assault an officer he had a personal grudge against. Inmate Moreno incited other inmates into joining in his assault on staff. To this day, Declarant Comfort does not believe that anyone is absolutely convinced that this explanation is the actual truth, but it is accepted as the most likely cause of the attack.

16. The incident contained many elements which contradicted the "one inmate with a grudge" explanation. For example, Inmate Moreno was not known as a leader of the CRIPS affiliated inmates yet he was able to command a large number of other inmates to spontaneously assault staff.

17. Most riots are planned events, which seems consistent with the large number of weapons being found after the incident. However, inmate weapons were not used on staff, which seemed consistent with information that an attack on staff was not preplanned.

18. The investigation of a major incident, including this one, is a long process, complicated by

many factors. Initially, inmates will not talk to staff, because of anger, and hostility generated by the incident itself. This is especially true of the kind of inmates confined in C-Facility that have a history of anti-social behavior. The gang culture also forces its members and associates to refuse to deal with staff.

19. After the initial hostility and anger subsided the inmates were still unwilling to provide information. Inmates have television sets, radios, or CD players for entertainment. Ultimately, however, boredom set in and inmates were willing to provide information in order to have normal programming reinstated.

20. Information provided by inmates has to be checked and verified and confirmed by other sources before it can be considered trustworthy. Many inmates who are willing to talk to staff often provide deliberately false information, or third-hand information, or information that is not fact, but the inmate's own conjecture. It takes time to receive sufficient corroborating information to be sure that a release from a lockdown will not result in further violence.

21. Another threat that had to be investigated and resolved was the possibility of violence between the Southern Hispanic and African-American inmates. On January 9, 2002, a large number of inmate manufactured weapons were recovered. Even if the African-American inmates had not planned to attack staff, there was a high risk of future violence if they had been planning to attack other inmates.

22. Prior to the January 9, 2002 incident, there were rumors circulating in C-Facility that the Southern Hispanic inmates were planning to assault CRIP affiliated inmates, which would explain why the CRIPs had weapons on January 9, 2002.

23. Prison records reveal that the decision was made to release the lockdown gradually. The first step, instituted on April 11, 2002, was to permit African American and White inmates to have contact visits. This meant that all inmates at C-Facility would mingle in the visiting room and staff would be able to monitor their interactions. After it was determined that the visiting program was successful, a modified day room access program was instituted on June 13, 2002. On June 25, 2002, non-gang affiliate African American inmates were added to the day room. Finally, on August 1, 2002, a modified program for outdoor exercise was implemented for all inmates in C-Facility.

24. In addition to the threat posed by releasing African-American inmates from lockdown status, staff in C-Facility were also dealing with other inmate conflicts. Institutional records show that within one week of implementing the modified outdoor exercise program, "Bulldog" affiliated inmates and Southern Hispanic inmates were returned to lockdown status, and as of September 13, 2002, white inmates were also returned to lockdown status.

In support of the defendants' motion for summary judgment, Correctional Counselor V. Adams submitted a sworn declaration about the management of this lockdown. In it, V. Adams averred that when a lockdown occurs or when a war-

den declares a state of emergency, the staff of the affected institution are required to prepare formal Program Status Reports which outline the management Plan of Operation during the lockdown. These status reports continue until normalcy is achieved and are designed to notify both staff and inmates of prevailing conditions. As an attachment to his declaration, V. Adams submitted fourteen consecutive Program Status Reports covering the period from January 8, 2002, through August 8, 2002. These Status Reports are signed either by R. M. Comfort or D. Cuevas as Facility IV-C Captains and by Derral G. Adams as the Warden.

The content of each Report and explanatory "Remarks" at the bottom of each signed plan illustrate exactly what is contemplated by § 3383 of the Code, i.e., that the lockdown was under constant review by the responsible officials to determine when and how it could safely be lifted. These Reports read as a whole are not consistent with Noble's assertions of "indifference," and certainly not with his claim of "deliberate indifference." Similar Status Reports extending from August 8, 2002 through April 2003, when the lockdown was reinstated indicate attempted murders, a murder, assaults, batteries with weapons, and the discovery of numerous prisoner weapons within the Facility.

**[5]** The district court erred in viewing the end on January 30, 2002 of the formal investigation of the immediate precipitating causes of the riot, which in any event was not conclusive, as a point from which the officials must demonstrate additional "specific facts" or new disruptive events supporting their judgment that the emergency had not dissipated and that the lockdown must continue. The absence of any additional disruptive events was a good sign, but hardly one that signaled the evaporation of the tension that sparked this riot and clearly continued in its aftermath. The district court's approach manifestly trespassed against our warnings not to micro-manage prisons. Moreover, the absence of any new attacks demonstrates, if anything, appropriate prudence and

the success of the lockdown, not that it might lack a "penological purpose."

*Hayward* and *Hoptowit* do not support Noble's arguments. In *Hayward*, we determined that because the lockdown was in response to a genuine emergency, restrictions on exercise were appropriate. We said, "Other restrictions were eased as the prison administration determined that the emergency permitted. These decisions are delicate ones, and those charged with them must be given reasonable leeway." 629 F.2d at 603.

*Hoptowit*, which dealt with a prison lockdown imposed to restore order in light of a high level of tension and violence following the killings of an inmate and a guard, is also of no help to Noble's cause. We said as a general proposition that "when a genuine emergency exists, prison officials may be more restrictive than they otherwise may be, and certain services may be suspended temporarily." 682 F.2d at 1259. We added that "[i]n determining the existence of such needs, we must give reasonable leeway to prison officials." *Id.* (citing *Hayward*, 629 F.2d at 603).

**[6]** Parenthetically, we are unable to detect any actionable Eighth Amendment subjective intent in this case. The record refutes the contentions that the lockdown was in excess of what was required to restore order, was unrelated to the officials' security and safety responsibilities, and was kept in effect for a longer period than necessary. *Hoptowit*, 682 F.2d at 1258. This case shares none of the conditions or circumstances we discussed in *Hayward*, such as a prison administration "either unable or unwilling to deal with extreme conditions which the court had previously found to be cruel and unusual punishment." *Hayward*, 629 F.2d at 603 (discussing *Palmigiano v. Garrahy*, 443 F. Supp. 956 (D.R.I. 1977), *aff'd*, 616 F.2d 598 (1st Cir. 1980)). If anything, the record demonstrates that the officials were continuously, prudently, and successfully looking out for the safety, security, and welfare of *all* involved, staff and prisoners alike. This scenario is

precisely what the doctrine of qualified immunity is designed to cover.

## CONCLUSION

**[7]** In summary, in 2002 it would not have been clear to a reasonable officer that his or her conduct vis à vis the declaration of an emergency, the lockdown, or the curtailment of use of the exercise yard was unlawful in the situation he or she confronted. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

REVERSED and REMANDED with instructions to enter judgment on behalf of the Defendants.