FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAURICE P. OLIVIER, AKA Maurice Pierre Olivier,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>LEROY D. BACA, Los Angeles County Sheriff of Custody Operations,<br>*Defendant-Appellee.* | No. 13-56371<br><br>D.C. No. 2:08-cv-07169-JFW-AGR<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted August 10, 2018
Pasadena, California

Filed January 11, 2019

Before: Consuelo M. Callahan and Jacqueline H. Nguyen, Circuit Judges, and David A. Ezra,* District Judge.

Opinion by Judge Callahan

---

*The Honorable David A. Ezra, United States District Judge for the District of Hawaii, sitting by designation.

# SUMMARY**

### Prisoner Civil Rights

The panel affirmed the district court's summary judgment in favor of defendant Sheriff Baca in a 42 U.S.C. § 1983 action alleging that Baca violated plaintiff's Fourteenth Amendment rights by failing to provide him with a bed during his three-and-a-half day stay at the Los Angeles Inmate Reception Center while he was a pretrial detainee.

The panel held that the Los Angeles Sheriff's Department was well within the scope of its authority to maintain security when it carried out the lockdowns that delayed plaintiff's transfer to permanent housing, resulting in three-and-a-half days without a bed. The panel held that, in view of the deference the Supreme Court has prescribed in the area of correctional facility policy, along with Baca's clarifications of the rationale underlying Department procedures, there was no basis in the record on which to conclude that the response to the inmate disturbances constituted an unnecessary or unjustified response to problems of jail security.

The panel further held that even if a Fourteenth Amendment violation did occur, the district court correctly held that Baca was entitled to qualified immunity because the right asserted by plaintiff—not being forced to sleep on the floor during a jail lockdown—was not clearly established at the time of the events.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

R. Chris Lim (argued), Los Feliz Law APC, Los Angeles, California, for Plaintiff-Appellant.

Jonathan Carl Magno (argued), Daniel Lee, and Paul B. Beach, Lawrence Beach Allen & Choi PC, Glendale, California, for Defendant-Appellee.

**OPINION**

CALLAHAN, Circuit Judge:

On the night of July 12, 2006, Plaintiff-Appellant Maurice Olivier ("Olivier") was arrested and taken to the Los Angeles County Inmate Reception Center ("IRC") for processing into permanent housing. Due to a series of disturbances by inmates and lockdowns throughout the Los Angeles County jail system, Olivier was not transferred to permanent housing until the afternoon of July 16, 2006. Olivier brought an action under 42 U.S.C. § 1983 against Defendant-Appellee Sheriff Leroy Baca ("Baca") in Baca's official and individual capacities, alleging that Baca violated his Fourteenth Amendment rights by failing to provide him with a bed during his three-and-a-half day stay at the IRC. The district court granted summary judgment in Baca's favor, holding that Olivier had not raised a genuine issue of material fact as to whether disturbances by inmates and lockdowns constituted exigent circumstances justifying the floor sleeping. Olivier appeals. We affirm and hold that the exigent circumstance of inmate disturbances and lockdowns justified denying Olivier a bed for his three-and-a-half day stay at the IRC.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.

On May 25, 2006, Olivier was arrested by the Los Angeles Police Department for burglary.  He was processed into permanent housing at Los Angeles Men's Central Jail ("MCJ") but erroneously released on July 7, 2006.  On July 12, 2006, the Los Angeles County Sheriff's Department ("LASD") located and again arrested Olivier.  At 9:56 p.m., he arrived at the IRC for processing into the county jail system.[1]

Upon Olivier's arrival at the IRC, he was determined to have health issues.  Consequently, Olivier was sent to the medical screening area of the IRC where he waited on a bench for an examination, along with around 100 other people.

LASD officials determined that Olivier could be properly housed only at MCJ in light of his medical needs, his classification as a non-high risk inmate without mental

---

[1] The IRC serves as a hub for processing incoming and outgoing inmates in the jail system.  The process occurs in three stages: (1) "booking front," which involves an initial interview, screening, and photograph; (2) "class rear," which involves medical screening, fingerprinting and housing classification; and (3) "custody line," where inmates are fed, provided medication if applicable, and picked up by personnel from the housing facility to which they are assigned.  On average, more than 300 inmates are processed daily at the IRC.

illness, and the proximity of MCJ to the venue of his underlying criminal case.**²**

While Olivier was being processed at the IRC for transfer to MCJ, inmates at jail facilities across Los Angeles County repeatedly divided themselves along racial lines and fought. This string of inmate disturbances persisted for approximately three days and necessitated lockdowns at multiple facilities, which, in turn, delayed processing at the IRC. LASD logs and declarations from LASD personnel provide accounts of the disturbances.**³**

---

**²** In 2006, the LASD operated three housing facilities for male inmates within the Los Angeles County jail system: MCJ, Twin Towers Correctional Facility, and Pitchess Detention Center. Twin Towers housed exclusively inmates with high security risk classifications, inmates suffering from severe mental illness, and sexually violent inmates. Pitchess did not have medical services that would have accommodated Olivier's claimed medical condition. Additionally, Pitchess is located more than forty-five miles by road from the venue where Olivier's criminal case was scheduled. MCJ was thus the only suitable permanent housing for Olivier.

**³** On July 13, 2006, at 8:30 a.m., the IRC class rear was closed due to inmate fighting, causing inmate processing at the IRC to stop. On July 13 at 4:30 p.m., approximately 100 IRC custody line inmates could not be transferred due to inmate disturbances at Pitchess Detention Center. On July 13, Twin Towers was placed on full lockdown. From 11:15 p.m. on July 13 until 1:20 a.m. on July 14, inmate rioting occurred at the MCJ. On July 14, the MCJ remained on full lockdown from 2:05 p.m. to 8:09 p.m. From July 14 at 10:45 p.m. into the following days, the IRC's class rear and custody line were placed on lockdown. On July 15 at 9:30 a.m., and again at 6:00 p.m., the IRC booking front was on lockdown. On July 15, MCJ was on lockdown until late in the day. On July 16, Twin Towers was on lockdown from 6:00 a.m. to 9:00 a.m.

Olivier remained at the IRC for the duration of the inmate disturbances, lockdowns, and post-lockdown procedures before being transferred to MCJ on July 16. In total, Olivier was held at the IRC for approximately three-and-a-half days. Olivier testified that although there were benches in the cell where he was held, there was inadequate space to accommodate the number of detainees at the IRC. Olivier testified that no one slept on the benches because trying to do so would have led to a fight. As a result, Olivier slept on the floor during his time at the IRC. Olivier testified that he never asked for "a mattress, blankets, or any other sort of padding."

After the lockdowns began on July 13, the first time inmates were picked up from the IRC custody line was on July 16 around 2:00 a.m. Olivier was transferred to the MCJ at 1:14 p.m. on July 16.

## B.

On October 30, 2008, Olivier filed a complaint in district court alleging civil rights violations related to both his extended stay at the IRC and events that occurred after he was transferred to MCJ.[4] The district court dismissed certain aspects of Olivier's original claims, and Olivier amended his complaint several times. By the time the case reached the summary judgment stage, the only remaining claim relevant to this appeal was a Fourteenth Amendment claim against

---

[4] Olivier's claims relating to his experiences at MCJ were dismissed, aside from a Fourteenth Amendment claim regarding exposure to lice in his jail cell. The complaint also named a number of defendants in addition to Baca. On July 10, 2010, the district court dismissed all defendants except Baca.

Baca in his official and individual capacities regarding Olivier's being forced to sleep on the floor at the medical intake area of the IRC.

Baca filed a motion for summary judgment. After the magistrate judge recommended denying the motion for lack of evidence that exigent circumstances existed, the district court gave Baca an opportunity to supplement the record. Baca then submitted additional declarations by LASD officials. In 2013, the Operations Deputy at the IRC explained that in response to such disturbances a large proportion of jail staff must work to restore order. Jail personnel who do not respond to the disturbances and remain in other areas of the facility are, therefore, likely to be significantly outnumbered by inmates. Consequently, normal operations must be suspended and the entire facility placed on lockdown until order is restored and the staff-to-inmate ratio returns to normal in all areas of the jail. As part of a lockdown, no inmates are permitted to move in or out of the facility. This means inmate transfers to permanent housing are cancelled by the IRC for the duration of a lockdown. A lockdown at a facility in Los Angeles County may thus prolong processing times at the IRC. The Operations Deputy further explained that a lockdown in any one of the booking front, class rear, or custody line stages necessarily results in a lockdown in the other areas because each stage operates in connection with the others.

An LASD sergeant assigned to the MCJ during the time of the disturbances explained that after a lockdown is lifted, inmate movement cannot immediately resume. Following a lockdown caused by inmate disturbances, detention facility personnel must conduct thorough security checks, survey property damage, and address medical needs. These post-

lockdown procedures naturally lead to delays in inmate processing in excess of the length of the lockdowns themselves.

The magistrate judge concluded that the newly supplemented record conclusively demonstrated that the Los Angeles County jail system experienced exigent circumstances due to the disturbances and lockdowns. The magistrate judge recommended granting Baca's motion for summary judgment in its entirety.  On July 19, 2013, the district court accepted the magistrate judge's recommendations, granted summary judgment in favor of Baca, and dismissed the case with prejudice.

## II.  STANDARD OF REVIEW

A district court's order granting summary judgment is reviewed de novo. *McDonald v. Sun Oil Co.*, 548 F.3d 774, 778 (9th Cir. 2008).   The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).   Where, as here, the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## III.  ANALYSIS

A pretrial detainee is

> protected by the Fourteenth Amendment's Due Process Clause . . . .   Under the Due Process Clause, detainees have a right against

jail conditions or restrictions that amount to punishment. This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment.

*Pierce v. Cty. of Orange*, 526 F.3d 1190, 1205 (9th Cir. 2008) (internal citations and quotation marks omitted). For Olivier to state an actionable claim against Baca in his official capacity, Olivier must show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978). Local entities may also be "sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91. For Olivier to state an actionable claim against Baca in his individual capacity, he must show that Baca was personally involved in his alleged constitutional deprivation by, for example, acting, or failing to act, in a manner that was deliberately indifferent to Olivier's constitutional rights. *Starr v. Baca*, 652 F.3d 1202, 1206 (9th Cir. 2011).

## A.

Olivier argues that summary judgment was improper because the evidence in the record establishes a triable issue as to whether the disturbances by inmates and lockdowns justified his floor sleeping.

It has long been recognized that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974). The Supreme Court has explained that measures to preserve security and order "may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). In this regard, corrections officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547; *Bull v. City and Cty. of San Francisco*, 595 F.3d 964, 972 (9th Cir. 2010) (en banc). The Supreme Court has reaffirmed this principle, explaining that—in addressing a § 1983 claim brought by a pretrial detainee— "courts must defer to the judgment of correction officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence v. Bd. of Chosen Freeholder of Cty. of Burlington*, 566 U.S. 318, 322–23 (2012).

In the context of disturbances by inmates and lockdowns, we have held that such issues can delay detention facility procedures and temporarily restrict certain rights without violating the Eighth Amendment. *See, e.g.*, *Noble v. Adams*, 646 F.3d 1138, 1142–43 (9th Cir. 2011); *Norwood v. Vance*, 591 F.3d 1062, 1069 (9th Cir. 2010). In *Noble*, we held that a three-month curtailment of prisoners' outside exercise rights in response to a riot that hospitalized nine prison staff was not a violation of their Eighth Amendment rights. 646 F.3d at 1143. We stated that it was not yet clearly established "precisely how, according to the Constitution, or

when a prison facility housing problem inmates must return to normal operations . . . during and after a state of emergency called in response to a major riot." *Id.* In *Norwood*, we explained that "[o]fficials must balance [the duty to keep inmates safe] against other obligations that our laws impose . . . . '[P]rison officials have a right and duty to take the necessary steps to reestablish order in a prison when such order is lost.'" 591 F.3d at 1069 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982)).

Although *Noble* and *Norwood* involve prisoners and Eighth Amendment rights, the same considerations are relevant in the pretrial detainee context. Jails, just like prisons, "are responsible for maintaining internal order and discipline [and] for securing their institutions against unauthorized access or escape." *Bell*, 441 U.S. at 548 n.30 (quoting *Procunier v. Martinez*, 416 U.S. 396, 404 (1974)). Further, "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates." *Bell*, 441 U.S. at 546 n.28. The district court in *Thomas v. Baca*, 514 F. Supp. 2d 1201, 1225 (C.D. Cal. 2007), for example, recognized this principle when it suggested an exception to the general rule that each inmate in LASD facilities must be provided with a bunk: "A sudden, extreme rise in inmate population caused by an acute event, such as a civil disturbance, may affect the length of time that is reasonable for processing."

Here, LASD was well within the scope of its authority to maintain security when it carried out the lockdowns that delayed Olivier's transfer to permanent housing, resulting in three-and-a-half days without a bed. The evidence is uncontroverted that, over this period of time, LASD was confronted with emergencies that threatened the safety and

security of its facilities. It is also clear that the jail officials' response to the security threats was reasonable in its scope and effective in controlling the disturbances. *See Bell*, 441 U.S. at 540 ("Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting . . . ."). Indeed, Olivier was promptly transferred to permanent housing after the disturbances had been controlled. Thus, in view of the "wide-ranging deference," *id*. at 547, the Supreme Court has prescribed in the area of correctional facility policy, along with Baca's clarifications of the rationale underlying LASD procedures, there is no basis in the record on which to conclude that LASD's response to the inmate disturbances constituted "an unnecessary or unjustified response to problems of jail security." *Florence*, 566 U.S. at 322.

Olivier relies on *Thomas v. Ponder*, 611 F.3d 1144, 1155 (9th Cir. 2010), to support his argument that his holdover at the IRC raises an issue of material fact, but *Ponder* is distinguishable. In *Ponder*, we held that an indefinite deprivation of out-of-cell exercise lasting for fourteen months raised a genuine issue of material fact as to whether the prison officials acted reasonably. *Id.* at 1156. The first two months of deprivation of out-of-cell activity was due to a prison-wide lockdown in the wake of stabbings of two correctional officers. *Id.* Prison officials argued that prolonging the plaintiff's punishment for an additional year was justified, in part, because of "occasional documented threats" that ensued. *Id.* We rejected the prison officials' argument, finding that a genuine issue of material fact existed as to whether the 14-month deprivation was reasonable. *Id.* at 1152.

Here, in contrast, the evidence shows that LASD addressed a nearly uninterrupted series of riots and civil disturbances involving hundreds of inmates, and resumed normal operations within a matter of hours after jail officials regained control of their facilities. The differences in both the extent of the civil disturbances and the length of the deprivation make *Ponder* unhelpful to Olivier's argument.[5]

**B.**

Olivier also argues that the district court erred in granting summary judgment in favor of Baca based on qualified immunity. He contends that, although the specific issue of floor sleeping during inmate processing due to exigent circumstances had not been held unconstitutional, "the unlawfulness was apparent under the circumstances." Olivier further contends that Baca should have been "prohibit[ed] . . . from arguing . . . qualified immunity . . . [b]ased upon Appellant's collateral estoppel arguments."

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing

---

[5] Olivier also argues that an inference is proper that the disturbances and lockdowns that led to his holdover at the IRC were natural consequences of prison overcrowding. He contends that if such disturbances are common they should not excuse constitutional violations. Olivier, however, has not presented any admissible evidence to demonstrate, as he claims, that riots were the natural and foreseeable consequences of overcrowding in Los Angeles County jails. Olivier cites in his brief two internet articles—published over ten years after the events at issue—reporting generally on overcrowding in Los Angeles jails. However, as these articles were not in the record before the district court, they do not undermine the district court's decision. *See U.S. v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007). Accordingly, we reject this argument.

(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). For a right to be "clearly established," existing "precedent must have placed the statutory or constitutional question beyond debate," such that "every" reasonable official would have understood that he was violating a clearly established right. *Id.* at 741. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted). The burden is on the party contesting qualified immunity to show that a law was clearly established at the time of an alleged violation. *Davis v. Scherer*, 468 U.S. 183, 197–98 (1984).

Olivier has not demonstrated that the law regarding floor sleeping, in the context of exigent circumstances, was or is clearly established. *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989), overruled on other grounds by *Bull*, 595 F.3d at 981, and *Rutherford v. Pitchess*, 457 F. Supp. 104, 109 (C.D. Cal. 1978), held that forcing detainees to sleep on the ground is a constitutional violation. However, those cases did not involve exigent circumstances, and thus any "unlawfulness" cannot be said to have been "apparent" to Baca in the context of the inmate disturbances at issue here. Olivier also cites *Thomas* to support his argument that it is clearly established that inmate processing should take no longer than twenty-four hours. 514 F. Supp 2d at 1215. *Thomas*, a district court decision, was not decided until over a year after the events at issue, so that case could not have "placed the . . . constitutional question beyond debate" at the time of Olivier's delay at the IRC. *See al-Kidd*,

563 U.S. at 741. Additionally, *Thomas* explicitly recognized an exception to its general inmate processing guidelines for exigent circumstances such as civil disturbances. 514 F. Supp. 2d at 1218–19.

Finally, we reject Olivier's argument that collateral estoppel should have prevented Baca from claiming qualified immunity. Collateral estoppel bars successive litigation of an issue of fact or law actually litigated and resolved in a prior court determination even if the issue recurs in the context of a different claim. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1040–41 (9th Cir. 2017). The issue presented in this case—floor sleeping due to exigent circumstances—was not addressed in any of the cases cited by Olivier, and the district court in *Thomas* specifically recognized an exigent circumstances exception to its holding that floor sleeping is unconstitutional. 514 F. Supp. 2d at 1218–19. Accordingly, collateral estoppel does not apply.

In sum, Olivier has not shown that a genuine issue of material fact exists as to whether Baca was entitled to qualified immunity.[6]

## C.

Olivier also argues that the district court abused its discretion by: (1) declining to transfer the case to another courtroom as a related case; (2) failing to authorize punitive damages against Baca; (3) failing to take judicial notice of his

---

[6] Baca also argues that Olivier failed to exhaust the administrative remedies available to him under the Prison Litigation Reform Act. Because we hold that the district court did not err in granting summary judgment, we do not reach this issue.

opposition motion; and (4) admitting declarations from LASD officials. None of these arguments is persuasive.

First, the district court did not abuse its discretion by declining to transfer the case because the record does not indicate that Olivier filed a Notice of Related Civil Cases, as he was required to do for the district court to consider transferring the case. C.D. Cal. R. 83-1.3.1. Second, punitive damages are not available against Baca in his official capacity, *see Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th Cir. 1996), and Olivier's claim for punitive damages against Baca individually is moot in light of our holding that Baca is entitled to qualified immunity. Third, the district court did not abuse its discretion by declining to take judicial notice of Olivier's opposition motion because "[l]egal memoranda . . . are not evidence, and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Flaherty v. Warehousemen, Garage & Serv. Station Empls.' Local Union No. 334*, 574 F.2d 484, 486 n.2 (9th Cir. 1978). Finally, the district court did not abuse its discretion by admitting declarations from LASD officials because the officials had personal knowledge of both the events and the LASD procedures at issue. Fed. R. Civ. P. 56(c)(4); *see, e.g.*, *S.E.C. v. Phan*, 500 F.3d 895, 913 (9th Cir. 2007).

## IV.  CONCLUSION

Olivier has not presented a basis for disturbing the district court's judgment. The evidence is uncontroverted and summary judgment was proper as a matter of law. In addition, even if a Fourteenth Amendment violation did occur, the district court correctly held that Baca is entitled to qualified immunity because the right asserted by Olivier—not being  forced  to  sleep  on  the  floor  during  a  jail

lockdown—was not clearly established at the time of the events.  Finally, Olivier has not shown that the district court abused its discretion in rejecting his various ancillary claims.
**AFFIRMED.**