IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark Rokita, and All Others          :
Similarly Situated,                  :
                    Petitioner       :
                                     :
        v.                           :  No. 182 M.D. 2020
                                     :  SUBMITTED:  September 25, 2020
PA Dep't of Corr.,                   :
                    Respondent       :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                          FILED:  November 20, 2020

Petitioner Mark Rokita (Rokita), an inmate at the State Correctional Institution at Houtzdale (SCI-Houtzdale), has filed a Petition for Review (Petition) in our original jurisdiction, on behalf of himself and all others similarly situated, in which he alleges that Respondent PA Dep't of Corr.[1] (Department) has violated his constitutional rights pursuant to the First, Eighth, and Fourteenth Amendments of the United States Constitution,[2] as well as unspecified provisions of the Pennsylvania Constitution. Petition, ¶1. Rokita challenges two Department policies on those constitutional grounds, DC-ADM 801 HOU 2 (HOU 2), which establishes a "Violence Reduction Strategy" (VRS) at SCI-Houtzdale, as well as DC-ADM 804, which sets forth the Department's internal prisoner grievance process. *Id.*, ¶¶10, 21-24, 34-35.

_____

[1] The proper name for this entity is the Commonwealth of Pennsylvania, Department of Corrections.

[2] U.S. CONST. amends. I, VIII, and XIV.

The Department has filed Preliminary Objections in response, demurring to the Petition on the basis that Rokita has failed to state a claim upon which relief can be granted. Upon review, we sustain the Preliminary Objections and dismiss the Petition with prejudice.

## I. Facts and Procedural History

Rokita's Petition is not a model of clarity, but we understand the operative facts, as averred by him and established through the exhibits attached to the Petition, to be as follows.

In 2019, SCI-Houtzdale promulgated HOU 2, which memorialized the creation at the prison of

> a Violence Reduction Committee [(Committee)] for the purpose of establishing a [VRS] for SCI[-]Houtzdale. This strategy will be multidimensional to include proactive planning and response strategies that provide strategic oversight; assist with risk identification and needs assessments[;] and implement response strategies to prohibited violent acts.

Petition, Ex. S. The Committee's membership contains a broad swath of SCI-Houtzdale employees, from various deputy superintendents to members of the maintenance staff. *Id.* As for the VRS, it identifies classes of various prohibited violent acts, as well as how the perpetrators of those acts will be handled, and establishes that "[i]n the event of a prohibited violent act, the units where the involved offenders are housed will be immediately placed on lockdown or restricted movement." *Id.*, Exs. S-Z.

On October 29, 2019, Rokita returned to Unit J-B, where he was housed, and was informed by prison personnel that the unit had been placed under lockdown pursuant to the VRS, due to a violent incident that had occurred while Rokita was elsewhere. *Id.*, ¶2. According to Rokita,

2

> [he], along with the entire unit[,] . . . was locked down for [three] days in their cells with absolutely no movement beyond their cell doors, . . . followed by [three] days of res[t]ricted, limited movement. During this [six-]day duration petitioner and all other inmates on this unit were denied[] visits, access to the law library, access to any religious services, access to any recreational passes, and out[]side recreation.

*Id.* During the period of restricted movement, Rokita heard that the lockdown had been caused by a mentally ill inmate, who had gotten into an argument with a prison guard after refusing to follow the guard's commands and had then been pepper sprayed by the guard. *Id.*, ¶3.

On November 3, 2019, Rokita filed an inmate grievance, in which he claimed that the lockdown was punitive in nature, had stopped him from communicating with family members, and had prevented him from showering, exercising, accessing the law library, and going to religious services. *Id.*, Ex. A. Rokita argued that locking him down without giving him a chance to challenge that action in advance violated his due process rights under the Fourteenth Amendment. *Id.* In addition, he alleged violations of his rights secured by the First Amendment, the Eighth Amendment, and Article I of the Pennsylvania Constitution. *Id.* Rokita requested an independent review of HOU 2 and an investigation of SCI-Houtzdale's administrative staff, due to his belief that the policy was unconstitutional and that the staff was either unaware of or unwilling to treat him in accordance with his legal rights. *Id.* Rokita's grievance was denied, as were his two subsequent internal appeals of that denial. *Id.*, Exs. B(i)-F.

On December 18, 2019, an inmate beat another prisoner using a makeshift weapon, prompting a VRS lockdown to be declared again in Unit J-B. *Id.*, ¶¶12-13. This resulted in a three-day-long state of emergency in Rokita's unit and ultimately prevented Rokita from accessing the law library or attending religious services for

six days, as well as from going for recreation or using the showers for an unspecified amount of time. *Id.*, ¶13, Ex. G. Rokita then filed another grievance on December 22, 2019, in which he argued that the state of emergency and the resultant lockdown were merely pretexts for inflicting punishment without due process and were part of a broader pattern of such abuses by the Committee. *Id.* Rokita claimed that such actions violated his constitutional due process rights, requested "judicial review" of HOU 2 and the Committee, and "accuse[d] the framers of this policy [of] creating this sole[l]y to punish innocent individuals because they believe they will get away with it." *Id.* Rokita's second grievance was denied, as was his subsequent internal appeal. *Id.*, Exs. H(i)-(J).[3]

On February 26, 2020, Rokita filed his Petition with our Court. In his Petition, Rokita discusses the two aforementioned lockdowns and his resultant, unsuccessful grievances, while also referencing the similar experiences of other inmates at SCI-Houtzdale. *Id.*, ¶¶2-15, 17-19. Rokita alleges that VRS lockdowns are a constant occurrence at SCI-Houtzdale and that they actually have the opposite of their intended effect, stirring up anger and animosity among the inmates who, though they may not be involved in the violent behavior precipitating the lockdowns, are nonetheless consequently subject to collective limitations on the handful of freedoms and comforts still available to them in prison. *Id.*, ¶¶16-19.[4] Rokita claims that VRS

---

[3] Nothing in the Petition itself or the attached exhibits shows that Rokita appealed the denial of this internal appeal.

[4] Rokita also alleges that correctional officers will deliberately pair clearly incompatible inmates with each other as cellmates "for their own entertainment[, such as] an African-American . . . with an Aryan Brother[.]" Petition, ¶20. According to Rokita, if the true goal is to reduce violence, "[t]his [type of behavior] calls into question the motives and mental capacity of the staff and administration of the [Department.]" *Id.* In addition, Rokita raises questions about the Committee itself, which he claims is likely a sham organization that never actually meets. *Id.*

lockdowns are an abuse of power and flout the Fourteenth Amendment, as they impose atypical and significant hardships upon innocent prisoners and punish them without procedural due process. *Id.*, ¶¶26-31. In addition, he argues that these lockdowns constitute cruel and unusual punishment, infringing upon the Eighth Amendment, and also contravene the First Amendment by hampering access to the courts and interfering with religious activities. *Id.*, ¶¶27, 32. Finally, Rokita maintains that the Department's internal grievance system itself did not afford him the necessary level of procedural due process, in contravention of the Fourteenth Amendment, as the system allowed members of the Committee to both decide whether to initiate a lockdown and then rule upon a grievance challenging that lockdown. *Id.*, ¶¶14-15, 25.[5] As relief, Rokita requests that the Department be hereafter enjoined from violating his constitutional rights, as well as those of all others similarly situated, that HOU 2 and DC-ADM 804 be "dismantl[ed,]" and that Department staff be directed to learn about inmates' constitutional rights before any replacement policies were drafted or implemented. *Id.*, Wherefore Clause.

The Department responded by filing Preliminary Objections, through which it demurs to the Petition. Rokita has responded in opposition, and this matter is now ready for our consideration.

## II. <u>Standard of Review</u>

> In ruling on preliminary objections, this Court accepts as true all well-pled allegations of material fact, as well as all inferences reasonably deducible from those facts. *Key v. Pa. Dep't of Corr.*, 185 A.3d 421 (Pa. Cmwlth. 2018). However, this Court need not accept unwarranted inferences, conclusions of law, argumentative allegations, or expressions of opinion. *Id.* For preliminary objections to be sustained, it must appear with certainty that the law

---

[5] Rokita also mentions in passing *Monell v. Department of Social Services*, 436 U.S. 658 (1978), without articulating how *Monell* applies to the matter *sub judice*. *See* Petition, ¶33.

will permit no recovery. *Id.* Any doubt must be resolved in favor of the non-moving party. *Id.*

*Dantzler v. Wetzel*, 218 A.3d 519, 522 n.3 (Pa. Cmwlth. 2019).

### III. Discussion

The Department presents the following arguments in favor of its Preliminary Objections, which we have summarized and reordered as follows for clarity's sake. First, Rokita cannot establish that the Department is liable pursuant to *Monell* for violations of constitutional rights, as the Department is immune under the Eleventh Amendment of the United States Constitution[6] as an apparatus of our Commonwealth's government. Department's Br. in Support of Preliminary Objections at 24-26. Moreover, even ignoring such immunity, Rokita has failed to plead facts sufficient to support his argument that *Monell* liability attaches to the Department in this situation. *Id.* at 26. Second, Rokita's First Amendment claims are not legally viable, as he did not identify any specific injury suffered by him as a result of being unable to access the law library or incur anything more than a *de minimis* impact upon his religious rights. *Id.* at 21-24. Third, Rokita cannot state an Eighth Amendment-based claim, because the lockdowns he complains of do not constitute cruel and unusual punishment. *Id.* at 19-21. Finally, Rokita's claims rooted in the Fourteenth Amendment fail, as the lockdowns did not impose atypical and significant hardship upon Rokita when compared to the ordinary incidents of

---

[6] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

6

prison life. *Id.* at 14-18. As such, he was not entitled to due process in connection with these lockdowns. *Id.* We address each of these arguments in turn.[7]

A. *Monell* Liability

We agree with the Department that it is immune from *Monell* liability.[8] In *Monell*, the United States Supreme Court ruled that local governments could be held liable under 42 U.S.C. § 1983 for depriving individuals of their constitutional rights,

---

[7] We note that Rokita appears to style his Petition as a class action suit, as evidenced by his usage of the phrase "and all others similarly situated" in the caption and throughout his Petition. *See* Petition at 1, ¶¶26, 32, Wherefore Clause. However, it is well-settled that a *pro se* inmate is not allowed to initiate a class action lawsuit, in large part due to the fact that an individual without the proper level of legal education and experience is singularly ill-equipped to represent the interests of others in a court of law. *See Mobley v. Coleman*, 65 A.3d 1048, 1051 n.1 (Pa. Cmwlth. 2013). Therefore, we sustain the Department's Preliminary Objections and dismiss the Petition to the extent that the claims raised therein sound in class action. The remainder of this opinion will analyze whether the Department's demurrers should be sustained as to the claims put forth by Rokita on his own behalf.

[8]     Pa. R.C.P. No. 1030(3) provides that immunity from suit is an affirmative defense that must be raised in a responsive pleading under the heading of "new matter." *Id.* However, this Court has created limited exceptions to this rule. First, a party may raise the affirmative defense of immunity as a preliminary objection where it is clearly applicable on the face of the [petition for review]; that is, that a cause of action is made against a governmental body and it is apparent on the face of the pleading that the cause of action does not fall within any of the exceptions to . . . immunity. *Wurth v. City of Philadelphia*, . . . 584 A.2d 403, 407 ([Pa. Cmwlth.] 1990) (*en banc*). Second, where a party erroneously asserts an immunity defense in a preliminary objection, the failure of the opposing party to file a preliminary objection to the defective preliminary objection in the nature of a motion to strike for lack of conformity to law waives the procedural defect and allows the trial court to rule on the immunity defense. *Id.*; *see Gallagher v. City of Philadelphia*, . . . 597 A.2d 747, 750 (Pa. Cmwlth. 1991).

*Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1021-22 (Pa. Cmwlth. 2014). Here, sovereign immunity's applicability to this matter is evident on the face of the Petition and Rokita does not challenge the procedurally premature invocation of this affirmative defense.

7

but only when such deprivations were caused by the enforcement of official policies or customs. *Monell*, 436 U.S. at 690-95. Independent of the fact that Rokita failed to clearly articulate how such liability applies in this situation, *see* Petition, ¶33, the Department, as an appendage of our Commonwealth's government, cannot be subject to *Monell* liability due to the protections from suit afforded to states by the Eleventh Amendment. *Quern v. Jordan*, 440 U.S. 332, 338-41 (1979); *Lavia v. Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000). We therefore sustain the Department's Preliminary Objections to Rokita's assertions of *Monell* liability and dismiss the Petition to the extent that the claims therein rest upon this theory.

## B. Constitutional Claims

Generally speaking, Rokita is correct that his incarceration does not completely strip him of his constitutional rights.

> [P]risons are not beyond the reach of the Constitution. No "iron curtain" separates one from the other. . . . Indeed, . . . prisoners [must] be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration.
>
> . . . .
>
> The continuing guarantee of these substantial rights to prison inmates is testimony to a belief that the way a society treats those who have transgressed against it is evidence of the essential character of that society.
>
> However, while persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights. . . . These constraints on inmates, and in some cases the complete withdrawal of certain rights, are justified by the considerations underlying our penal system. . . . The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities. . . . Of course, these restrictions or retractions also serve, incidentally, as reminders that, under our system of justice,

8

> deterrence and retribution are factors in addition to correction.

*Hudson v. Palmer*, 468 U.S. 517, 523-24 (1984) (internal citations and quotation marks omitted). With these points in mind, we turn to Rokita's specific constitutional claims, in order to determine whether any of them pass legal muster at this stage in the proceedings.

<u>1. First Amendment</u>

<u>a. Access to the Courts</u>

Rokita does not articulate an actionable First Amendment claim regarding the lockdowns' effect upon his ability to use SCI-Houtzdale's law library. In order to state such a claim, Rokita was required to "allege[] an 'actual injury' in the *nature of a loss or rejection of a legal claim regarding sentencing or the conditions of confinement.*" *Hackett v. Horn*, 751 A.2d 272, 276 (Pa. Cmwlth. 2000) (emphasis in original). Rokita has failed to do this, instead merely speaking in general terms about how he was barred from accessing the law library during the two aforementioned lockdowns. *See* Petition, ¶¶2, 4, 13, 15, 30, 32, Exs. A, G.

<u>b. Ability to Exercise Religious Beliefs</u>

The same is true for Rokita's assertion that the Department, through the imposition of lockdowns, violated his First Amendment right to religious freedom.

> "Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 . . . (1987) (citations omitted). The Free Exercise Clause of the First Amendment prohibits prison officials from denying an inmate "a reasonable opportunity of pursuing his faith." *Cruz v. Beto*, 405 U.S. 319, 322 & n.2 . . . (1972). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, ... aris[ing] both from the fact of incarceration and from valid penological objectives—including deterrence of crime,

9

> rehabilitation of prisoners, and institutional security."
> *O'Lone*, 482 U.S. at 348 . . . (citation omitted).

*Rivera v. Silbaugh*, __ A.3d __, __ (Pa. Cmwlth. No. 1708 C.D. 2018, filed Sept. 21, 2020), slip op. at 14-15, 2020 WL 5624151, at *7. Here, Rokita complains in general terms that he was unable to attend "religious services" during the lockdowns, Petition, ¶¶2, 4, 1332, Exs. A, G, but does not explain how the lockdowns' temporarily restrictive conditions deprived him of "a reasonable opportunity of pursuing his faith." *Cruz*, 405 U.S. at 322. In light of this, we fail to see how his constitutional right to free exercise of religion was impinged upon, given that, when it comes to this right in the context of a carceral environment, "[t]here may be inconveniences so trivial that they are most properly ignored. In this respect, this area of the law is no different from many others in which the time-honored maxim '*de minimis non curat lex*' applies." *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004). Furthermore, we are skeptical that, in the absence of unique and compelling circumstances of the type not averred to in the Petition, the First Amendment requires the Department to permit inmates to attend group prayers in the midst of a lockdown imposed due to concerns about institutional safety. *See Booker v. Graham*, 974 F.3d 101, 107 (2d Cir. 2020); *cf. Lovelace v. Lee*, 472 F.3d 174, 187-89 (4th Cir. 2006) (prison's refusal, for disciplinary purposes, to permit a Muslim inmate to join in nearly any special meals or group prayers during Ramadan imposed a substantial burden upon his religious practices).

## 2. Eighth Amendment

Rokita's Eighth Amendment claim also fails to establish any basis for relief in his favor.

> In order to maintain a claim under the Eighth Amendment based upon prison conditions, an inmate "must satisfy both an objective and subjective test." *Allah v. Ricci*, 532 [F. App'x] 48[, 51] (3d Cir. 2013). Under these requirements,

10

> an inmate must demonstrate that the deprivation he alleges is "sufficiently serious" and that the correctional institution has deprived him of "minimal civilized measure of life's necessities." *Id.* . . . . Furthermore, an inmate must also demonstrate that the conditions under which he is confined pose a substantial risk of harm and that the officials who have allegedly deprived the inmate of such necessities did so with a sufficiently culpable state of mind and acted with deliberate indifference to the inmate's health or safety.[] *Id.*

*Thomas v. Corbett*, 90 A.3d 789, 797 (Pa. Cmwlth. 2014) (internal footnote omitted). Here, Rokita asserts that, during the lockdowns, he was denied the ability to receive visitors, communicate with family members, attend religious services, participate in recreational activities, use the showers, or visit the law library. Petition, ¶¶ 2, 13, 15, 32. Even assuming that these allegations are true, which we must at this stage, such restrictions imposed over the brief time period claimed by Rokita cannot support the conclusion that "he was deprived of the 'minimal civilized measure of life's necessities,' . . . or that his health and safety were at risk." *Allah*, 532 F. App'x at 51 (internal citations omitted).

### 3. Fourteenth Amendment

### a. Procedural Due Process in the Context of Prison Lockdowns

Furthermore, Rokita's argument that he was entitled to procedural due process, in the form of the ability to challenge the lockdowns' imposition, is misplaced. It is well-settled that inmates retain

> liberty interests which are protected by the Due Process Clause. . . . But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, 515 U.S. 472, 484 (1995) (internal citations omitted).

Such constraints on due process rights reflect the reality that "[t]he operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). This undertaking is impossible without adequate deterrence of and control over violence inside a prison's walls; as such, we must recognize that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974). "Within this volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson*, 468 U.S. at 526-27; *accord Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' *Hudson* . . . , 468 U.S. at 526, . . . having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

In light of the standard set forth in *Sandin*, as well as the inherently perilous security conditions found in prisons and the paramount interest in assuring internal institutional safety, we cannot deem the two lockdowns complained of by Rokita to have "impose[d an] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." 515 U.S. at 484. Both lockdowns were implemented in response to violent altercations involving inmates, incidents that self-evidently required responses from SCI-Houtzdale's staff members to ensure they maintained control over both the prison itself and the inmates housed there.

Indeed, Rokita himself essentially admits to how generally precarious the situation is at SCI-Houtzdale, writing that "[i]t has become common that at any given time at least one unit at SCI[-]Houtzdale is on VRS lockdown." Petition, ¶16. In Rokita's own estimation, lockdowns are not "atypical" at SCI-Houtzdale; instead, they are essentially to be expected as a matter of course, even if they do not occur on a predictable schedule. *See id.*, ¶19 ("A VRS lock-down comes without warning . . . at any time. [Rokita] admits to monitoring [his] housing unit as [he] await[s] . . . visit[ors] to make sure no incidents occur."). While this reality certainly may speak to systemic problems regarding institutional control at SCI-Houtzdale, it does not follow that Rokita is consequently imbued with the constitutional right to procedural due process regarding imposition of the lockdowns themselves, especially given that the duration of each lockdown was so brief. *Cf. Meachum v. Fano*, 427 U.S. 215, 225 (1976) (courts are loath to second-guess or apply procedural due process protections to "a wide spectrum of discretionary actions that traditionally have been the business of prison administrators").[9]

b. Procedural Due Process in the Context of Rokita's Administrative Grievances

Finally, Rokita's assertion that his procedural due process rights were violated via the manner in which the Department handled his grievances is legally infirm. Rokita sought to challenge the lockdowns through these grievances. However, as

_____

[9] We also must point out that, despite Rokita's belief to the contrary, the lockdowns did not punish him, in the sense that they were not imposed as a penalty in response to some prohibited act he had perpetrated. "Loss of freedom of choice and privacy are inherent incidents of confinement in [a prison]. And the fact that such detention interferes with [an inmate's] understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). Of course, we recognize that this does not change the fact that Rokita was unable to conduct certain activities during the course of the lockdowns; to him, there is no real-world difference between particularized punishment and non-punitive deprivations caused by the lockdowns.

already noted, the lockdowns did not "impose[] atypical and significant hardship[s] . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Therefore, the Department was not required to provide Rokita with procedural due process when considering and ruling upon his grievances.[10]

[10] It also bears mentioning that we have previously "recognize[d] that [the Department's] grievance process is constitutionally adequate." *Brown v. Wetzel* (Pa. Cmwlth., No. 318 M.D. 2015, Sept. 9, 2016), slip op. at 8, 2016 WL 4709887, at *4. *See* 210 Pa. Code § 69.414(a) (Section 414(a) of this Court's Internal Operating Procedures authorizes the citation of unreported panel decisions issued after January 15, 2008, for their persuasive value, but not as binding precedent).

That having been said, we would be remiss to ignore Rokita's assertion that Department employees who were involved in deciding whether to impose the aforementioned lockdowns also ruled upon Rokita's grievances challenging the lockdowns. *See* Petition, ¶¶14-15, 25. If true, the fact that the authors of challenged decisions got to decide whether these decisions were proper clearly makes a mockery of the idea that Rokita's grievances were handled in a fair and impartial manner and stands to undermine confidence in the Department's grievance process as a whole. As Justice Wecht has written,

> [i]nternal prison grievance processes and the manner of their operation raise substantial concerns about the adequacy and fairness of adjudications taking place therein. Several intrinsic deficiencies define the process, which have not gone unnoticed in the legal and academic community.[] Some commentators have questioned the fundamental fairness of allowing a governmental entity to police its own actions and to serve as an arbiter in disputes concerning those actions, in which it always is an interested party. *See* Van Swearingen, Comment, Imprisoning Rights: The Failure of Negotiated Governance in the Prison Inmate Grievance Process, 96 CAL. L. REV. 1353, 1378 (2008) ("A dispute resolution process in which the State defines the rules of the process and then becomes both a party in the dispute and adjudicator violates basic notions of procedural fairness."). Absent any type of oversight from a neutral arbiter, which may provide unbiased consideration of potentially viable legal claims, may require the observance of fundamental procedural protections, and may fashion appropriate legal remedies, an internal dispute resolution process in which the same entity is both a litigant and the judge allows for the resolution of claims in a manner that elevates institutional priorities over the rights of a claimant. *Id.* at 1377-78 (arguing that grievance processes can "alter the focus of the complaint process from one concerned primarily

**(Footnote continued on next page…)**

14

## IV. Conclusion

In light of the foregoing analysis, we conclude that all of Rokita's claims are without legal merit. Therefore, we sustain the Department's Preliminary Objections and dismiss the Petition with prejudice.[11]

_____
ELLEN CEISLER, Judge

---

              with the declaration of rights and wrongdoings to one focused on a prison's organizational goal of resolving disputes quickly and to its own advantage," potentially failing "to deter particular forms of constitutionally unlawful conduct within the prison walls" while simultaneously providing "a sense of legal legitimacy that may limit court-imposed liability").

*Brown v. Wetzel*, 177 A.3d 200, 210 (Pa. 2018) (Wecht, J., dissenting) (internal footnote omitted).

      Unfortunately, as Rokita was not entitled to due process in the context of his grievances, we are unable to provide him with relief for the reasons previously articulated in this opinion. "In so deciding we do not minimize the seriousness of a lockdown nor do we deny that [proper] administrative review of a lockdown decision might be desirable. . . . We are simply unable to say that the Constitution dictates such a procedure." *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (internal citation omitted).

     [11] As noted *supra*, Rokita mentions that the Department has also violated "several [of his] Pennsylvania constitutional rights," but does not specifically identify what those rights are or the provisions of the Pennsylvania Constitution he seeks to invoke. *See* Petition, ¶1. Therefore, we interpret his Pennsylvania Constitution-based claims as having no separate identity from his claims rooted in the United States Constitution and dismiss his Pennsylvania Constitution-based claims as well.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark Rokita, and All Others           :
Similarly Situated,                   :
     Petitioner                :
               :
    v.                            : No. 182 M.D. 2020
               :
PA Dep't of Corr.,                    :
      Respondent              :

# **O R D E R**

AND NOW, this 20th day of November, 2020, upon consideration of Respondent PA Dep't of Corr.'s Preliminary Objections to the Petition for Review filed by Petitioner Mark Rokita, and All Others Similarly Situated, and the response thereto, it is hereby ORDERED that the Preliminary Objections are SUSTAINED and that the Petition for Review is DISMISSED WITH PREJUDICE.

          _____

          ELLEN CEISLER, Judge